[No. B151252: Second Dist., Div. Five. Mar. 27, 2003.]

THE PEOPLE ex rel. ALLSTATE INSURANCE COMPANY, Plaintiff and Appellant, v.
DOUGLAS WEITZMAN et al., Defendants` and Respondents.

COUNSEL

Manning & Marder, Kass, Ellrod, Ramirez, Dennis B. Kass, David J. Wilson and Sylvia Havens for Plaintiff and Appellant.

Law Office of Steven L. Zelig, Steven L. Zelig; Law Office of Bruce Adelstein and Bruce Adelstein for Defendant and Respondent Douglas Weitzman.

Law Offices of Benjamin L. Hecht and Benjamin L. Hecht for Defendant and Respondent Isaak Zelyony.

Barnhill & Vaynerov, Steven M. Barnhill and Maxim Vaynerov for Defendant and Respondent Anatoly Bondarev.

Bonne, Bridges, Mueller, O'Keefe & Nichols, Joel Bruce Douglas and Melissa A. Brunsmann for Defendant and Respondent Merlin Smith.

Stephen F. Guiner for Defendant and Respondent Barbara A. Reid.

## OPINION

### TURNER, P. J.—

#### I. INTRODUCTION

This is a qui tam action. ■ A qui tam action has been defined as follows, "An action brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive." (Black's Law Dict. (7th ed. 1999) p. 1262, col. 1; *U.S. v. Kitsap Physicians Service* (9th Cir. 2002) 314 F.3d 995, 997, fn. 1.) The term "qui tam" comes from the Latin expression "qui tam pro domino rege quam pro se ipso in hac parte sequitur," which means, " 'who pursues this action on our Lord the King's behalf as well as his own'." (*Vermont Agency of Natural Resources v. United States ex rel. Stevens* (2001) 529 U.S. 765, 768, fn. 1 [120 S.Ct. 1858, 1860, 146 L.Ed.2d 836], italics omitted; *City of Pomona v. Superior Court* (2001) 89 Cal.App.4th 793, 797, fn. 1 [107 Cal.Rptr.2d 710].) The present suit has been brought on behalf of the People of the State of California pursuant to Insurance Code[1] section 1871.7 by a relator, Allstate Insurance Company (Allstate). A "relator" has been described thus: "The real party in interest in whose name a state or an attorney general brings a lawsuit. . . . A person who furnishes information on which a civil or criminal case is based; an informer." (Black's Law Dict. *supra,* p. 1292, col. 1; *In re Veterans' Industries, Inc.* (1970) 8 Cal.App.3d 902, 925 [88 Cal.Rptr. 303].) ■ Allstate alleged: defendants participated in an automobile insurance fraud conspiracy; it innocently paid out proceeds to

---

[1]All further statutory references are to the Insurance Code except where otherwise noted.

defendants; and it could pursue a qui tam action pursuant to section 1871.7. The trial court found it lacked subject matter jurisdiction because the allegations of the complaint were based upon previously publicly disclosed allegations or transactions. (§ 1871.7, subd. (h)(2)(A).) The trial court further held Allstate was not an original source of the information concerning defendants' participation in acts of insurance fraud because it had previously been disclosed. (§ 1871.7, subd. (h)(2)(A) & (B) (subdivision (h)(2) hereafter).) Accordingly, the trial court dismissed the action. The trial court ruled and defendants contend that the "public disclosure" and "original source" rules applicable to the federal False Claims Act (31 U.S.C. § 3730 et seq.) apply with equal force to an action brought by an insurer pursuant to section 1871.1. We conclude subdivision (h)(2) does not jurisdictionally bar Allstate from pursuing the present case and reverse the dismissal order.

## II. BACKGROUND

### A. *The 1995 Action Brought by Financial Insurance Company*

In early 1995, an adjuster with Financial Insurance Company (Financial) became suspicious that a claim filed by an insured might be fraudulent—that the accident involved was staged. The adjuster referred the matter to Financial's special investigations unit. The insured confessed that the claim was fraudulent. Further investigation of Financial's claims files revealed at least 27 purported collisions giving rise to at least 90 fraudulent insurance claims.

On June 25, 1995, Financial filed a section 1871.7 action. Financial was represented by the law firm of what is now Manning & Marder, Kass, Ellrod, Ramirez (the Manning firm). The Manning firm is also counsel for Allstate in the present case. The Financial complaint alleged the existence of an automobile insurance fraud ring led by Attorneys Gary A. Laff, Bernard J. Berry, Jerry Widawski, Douglas W. Weitzman, and Barbara A. Reid, aided by a capper, Angel Sepulveda.

As required by section 1871.7, subdivision (e)(2),[2] the June 25, 1995, Financial complaint was filed under seal and was not disclosed to the public. Because there was an ongoing criminal investigation of some of the defendants in the Financial action, the complaint remained under seal until September 18, 1996. On that date, an *unsealed* first amended complaint was filed.

---

[2]Section 1871.7, subdivision (e)(2) states: "A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the district attorney and commissioner. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The local district attorney or commissioner may elect to intervene and proceed with the action within 60 days after he or she receives both the complaint and the material evidence and information. If more than one governmental entity elects to intervene, the district attorney shall have precedence."

Financial's first amended complaint alleged in part, "On information and belief, including information from accomplice or informant interviews, numerous other insurance companies also received false and fraudulent claims from the staged accident ring operated by the named defendants." Allstate's complaint was filed on October 14, 1997, nearly 13 months after Financial filed its first amended complaint.

## B. *Public Disclosures Relating to the Financial Action*

On September 18, 1996, when Financial's first amended complaint was filed, and as part of the criminal investigation of the alleged fraudulent conspiracy, search warrants were executed at several law offices. On October 1, 1996, the Los Angeles Daily Journal published an article discussing the searches. (Harris, *Investigations Carried Out At PI Offices*, L.A. Daily J. (Oct. 1, 1996) p. 1, col. 1.) Identified as defendants were Mr. Laff, Mr. Widawski, Mr. Weitzman, Mr. Berry, and Ms. Reid, who were attorneys. Identified as Financial's counsel was Dennis B. Kass of the Manning firm. The article stated: the Financial action was the first to be brought under section 1871.7; defendants had been accused, along with "medical offices," "of being co-conspirators in a large auto insurance fraud ring"; Department of Insurance investigators had executed search warrants at the law offices of Mr. Laff, Mr. Widawski, and Mr. Weitzman. (L.A. Daily J., *supra,* p. 1.) In a response to the trial court's order to show cause re dismissal in the present case, Mr. Kass declared that while he had been present outside the offices during the searches, he had not entered any of the premises while they were being searched; moreover, he had never seen any of the documents seized in those searches as they had remained under seal.

An October 9, 1996, letter published in the Los Angeles Daily Journal responded to the October 1 article. It described the execution of the search warrant at Mr. Laff's office as follows: "Approximately 30 flak-jacketed 'officers,' with guns drawn, came running down office hallways and barged into Mr. Laff's offices to serve the search warrant. What Mr. Kass[, Financial's attorney,] was overseeing was, in effect, 'discovery' by Gestapo tactics. [¶] I hav[e] nothing to do with Mr. Laff or any of the issues or subject matter of the underlying case. However, it may well be prophetic for all in society when, as one of the officers was leaving at the end of the day, he said to me in the hall as the elevator door closed, 'We're coming for you next.'" (Letters to the Editor, *'Gestapo Tactics' Used In Law Office Search,* L.A. Daily J. (Oct. 9, 1996) p. 7, col. 2.)

In February 1997, copies of the search warrant for Mr. Laff's office and home, and the underlying probable cause affidavit, were filed in *People v.*

*Laff,* Los Angeles County Superior Court case No. BC130312. The affiant, a Department of Insurance fraud division investigator, described in detail the results of an investigation initiated in October 1995 on information received from Financial. The affiant identified as suspects, among others: Mr. Laff; Mr. Weitzman; Ms. Reid; an office administrator, Gary Karpel, who was also known as Gary Karp; a physician, Dr. Leonid Modilevsky; Downtown Metro Medical Clinic; a chiropractor, Anatoly Bondarev, D.C.; and ABS Healthcare and Rehabilitation Center. All of these individuals or entities were named as defendants in the present action filed by Allstate. The affiant described in detail 27 allegedly staged accidents as to which claims were filed with Financial.

An April 7, 1997, article in the California law business section of the Los Angeles Daily Journal discussed in general terms the Financial case, section 1871.7, and the interplay between private and government resources under the statute. The article contained the following comment, "Kass said that other insurance company clients have also shown an interest in having the firm bring similar suits, particularly given that Manning Marder is now one of the few firms with expertise in this relatively new area of the law." (*Citizen's Arrest,* L.A. Daily J. (Apr. 7, 1997) Cal. Law Business section.)

### C. *Allstate's Investigation and Complaint*

In October 1996, within six weeks of the unsealing of the Financial complaint and one month after the publication of the Daily Journal article describing the law office searches, a senior special investigations unit analyst for Allstate, Richard Wong, spoke with a number of insurance agents. It bears emphasis that Mr. Wong's following description of Allstate's investigation was uncontradicted. In a declaration filed in opposition to the trial court's order to show cause re dismissal in this case, Mr. Wong stated as follows. He was responsible for spotting patterns of fraudulent insurance claims and reviewing claims paid for indications of fraud. The investigation Mr. Wong initiated in October 1996 revealed a pattern of repetitive accident and medical reports and claims submitted by three of the lawyers named in the Financial action—Mr. Laff, Ms. Reid, and Mr. Weitzman—as well as a fourth attorney, David Berger. Also, Mr. Wong discovered that most of the reports used to support the claims were written by certain medical providers. Over 100 files showed uniformity in descriptions of accidents, injuries sustained, course of treatment, and medical reports. Ultimately, Allstate obtained 78 taped confessions concerning 47 staged collisions. The confessors implicated Mr. Weitzman, Mr. Berger, Ms. Reid, and Mr. Laff, and other defendants subsequently named in the Allstate complaint. The information was turned over to the Manning firm. Mr. Wong declared: "I

discovered [the information on which the allegations in the present action are based] through my own efforts of reviewing files of claims paid by Allstate. I did not first learn this information from any source other than my own efforts." In addition, Mr. Wong asserted that no one at the Manning firm gave him any information about the claims in the Financial action until October 1997 (when the present lawsuit was filed).

Mr. Wong spoke with a Financial employee about a key witness, Glenna Cline. Ms. Cline lived with Mr. Sepulveda, the man identified as the principal coordinator of the staged collisions at issue in the Financial case. Mr. Sepulveda had died in 1994. With respect to Ms. Cline, Mr. Wong declared: "I retained an investigator who originally contacted Ms. Cline during the course of my pre-litigation investigation of this matter. She described more details about the conspiracy that is alleged in this action. Upon learning that [Financial] was suing some of the same defendants that were the subject of my investigation, I gave [Financial] the information regarding Ms. Cline. Subsequent to my disclosure to Financial, Ms. Cline testified as a witness in the [Financial] action."

Attorneys for Financial took Ms. Cline's deposition in February 1997. She testified Mr. Sepulveda had worked for several attorneys, "selling" them fraudulent accident cases. Those attorneys included Mr. Widawski, Mr. Weitzman, Mr. Laff, and Ms. Reid. Mr. Sepulveda staged the accidents and then "sold" the cases to the attorneys. Mr. Sepulveda would take cases to Neil Shekhter and be paid cash for them. Mr. Sepulveda was not the only person who took cases to the attorneys. The law offices gave Mr. Sepulveda the names of clinics to use. Ms. Cline also identified "Gary Karp" as a participant.

Allstate filed its complaint on October 14, 1997. Allstate alleged an internal investigation it had commenced one year earlier, in October 1996, had unveiled fraudulent insurance claims resulting from defendants' staged accident activities. The fraudulent claims involved at least 99 collisions occurring between January 1992 and April 1996, and at least 326 separate claimants. Allstate sued nine defendants in common with the Financial action: Mr. Laff, Ms. Reid, and Mr. Weitzman (as well as their law offices); Dr. Modilevsky, the physician; Dr. Bondarev, the chiropractor; Downtown Metro Medical Clinic, Inc.; ABS Health Care and Rehabilitation Center; and Mr. Shekhter and Mr. Karpel, who were alleged to be office staff. Allstate also sued more than 30 persons who were not parties to the Financial action—an attorney, Mr. Berger, six doctors, six medical offices, three chiropractors, eight cappers, and seven office staffers.

As required by section 1871.7, subdivision (e)(2), Allstate served a "material statement" on the district attorney and the Insurance Commissioner

detailing the facts in support of its complaint. Allstate set forth the facts as to 99 allegedly fraudulent collisions. In nearly half of the 99 cases, the participants had confessed that the accidents were staged.

### D. *Proceedings in the Trial Court*

On October 20, 2000, over three years after Allstate filed its complaint, the trial court issued an order to show cause why the lawsuit should not be dismissed under subdivision (h)(2). The October 20, 2000, order to show cause stated in part: "A prior qui tam action[, the Financial case,] alleged a conspiracy among the same lawyers, and others to stage automobile accidents and present fraudulent claims to [Financial]. [¶] . . . [¶] Here, it appears that the charged conspiracy was publicly disclosed in the [Financial] case. [¶] . . . It [further] appears . . . that Allstate was not the original source. [¶] Plaintiff is accordingly ordered to show cause . . . why this case should not be dismissed for lack of subject matter jurisdiction. . . . [¶] In connection with the order to show cause, the court intends to take judicial notice of all papers within the Allstate and [Financial] case files."

After considering the evidence and argument of the parties, the trial court found the present action was based upon the public disclosure of the insurance fraud ring; further, Allstate was not an original source of the information. The trial court reasoned the insurance fraud ring was publicly disclosed by the Financial pleadings, the search warrant and the underlying affidavit, the media coverage, and Ms. Cline's deposition. The trial court stated: "[T]he First Amended Complaint in the [Financial] case, the search warrant, the media coverage and the deposition of Glenna Cline all made 'allegations' of a conspiracy to submit fraudulent automobile accident claims that involved the key parties in the Allstate case." The trial court further found the specific facts alleged by Allstate were merely derivative of the publicly disclosed existence of the fraud ring. Finally, the trial court concluded, Allstate was not an original source of the "core information." An order dismissing the complaint was entered.

### III. DISCUSSION

### A. *Standard of Review*

The question of whether Allstate's action is barred by subdivision (h)(2) requires the interpretation and application of the statute to undisputed facts. As such, the issue presented is a question of law subject to our de novo review. (*Rothschild v. Tyco Internat. (US), Inc.* (2000) 83 Cal.App.4th 488, 493 [99 Cal.Rptr.2d 721]; *Olsen v. Breeze, Inc.* (1996) 48 Cal.App.4th 608,

621 [55 Cal.Rptr.2d 818]; *Service Employees Internat. Union v. County of Los Angeles* (1990) 225 Cal.App.3d 761, 774 [275 Cal.Rptr. 508].)

■ We apply the following standard of statutory review described by our Supreme Court, "When interpreting a statute our primary task is to determine the Legislature's intent. [Citation.] In doing so we turn first to the statutory language, since the words the Legislature chose are the best indicators of its intent." (*Freedom Newspapers, Inc. v. Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 826 [25 Cal.Rptr.2d 148, 863 P.2d 218]; *People v. Jones* (1993) 5 Cal.4th 1142, 1146 [22 Cal.Rptr.2d 753, 857 P.2d 1163].) Further, our Supreme Court has noted, " 'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) . . . .' " (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934].) However, the literal meaning of a statute must be in accord with its purpose as our Supreme Court noted in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 658-659 [25 Cal.Rptr.2d 109, 863 P.2d 179] as follows: "We are not prohibited 'from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.] Literal construction should not prevail if it is contrary to the legislative intent apparent in the [statute] . . . .' " In *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299], our Supreme Court added: ■ "The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act. [Citations.] An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in the light of the statutory scheme [citation] . . . ." The Supreme Court has held: " 'The courts must give statutes a reasonable construction which conforms to the apparent purpose and intention of the lawmakers.' (*Clean Air Constituency v. California State Air Resources Bd.* (1974) 11 Cal.3d 801, 813 [114 Cal.Rptr. 577, 523 P.2d 617].)" (*Webster v. Superior Court* (1988) 46 Cal.3d 338, 344 [250 Cal.Rptr. 268, 758 P.2d 596].) ■ Further, the Supreme Court has held: "We have recognized that a wide variety of factors may illuminate the legislative design, ' "such as context, the object in view, the evils to be remedied, the history of the time and of legislation upon the same subject, public policy and contemporaneous construction." ' (*In re Marriage of Bouquet* [(1976)] 16 Cal.3d 583, 587 [128 Cal.Rptr. 427, 546 P.2d 1371], quoting *Alford* v. *Pierno* (1972) 27 Cal.App.3d 682, 688 [104 Cal.Rptr. 110].)" (*Walters v. Weed* (1988) 45 Cal.3d 1, 10 [246 Cal.Rptr. 5, 752 P.2d 443].)

## B. *Section 1871.7*

Pursuant to section 1871.7, subdivision (a), "It is unlawful to knowingly employ runners, cappers, steerers, or other persons to procure clients or patients to perform or obtain services or benefits pursuant to [the workers' compensation law] or to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer." A civil action for a violation of section 1871.7 may be brought by a district attorney or by the Insurance Commissioner. (§ 1871.7, subd. (d).) In addition, a section 1871.7 action may be brought by "interested persons." (§ 1871.7, subd. (e)(1).) Section 1871.7, subdivision (e)(1) states: "Any interested persons, *including an insurer*, may bring a civil action for a violation of this section for the person and for the State of California. The action shall be brought in the name of the state. . . ." (Italics added.) The district attorney or Insurance Commissioner may, within 60 days, opt to take over an action brought by an interested person. (§ 1871.7, subd. (e)(4)(A).) If the district attorney and the Insurance Commissioner decline to do so, the interested person has the right to conduct the action. (§ 1871.7, subd. (e)(4)(B).)

Section 1871.7 authorizes: $5,000 to $10,000 in civil penalties against perpetrators of insurance fraud for each fraudulent claim presented to an insurance company; an assessment of up to three times the amount of each claim for compensation; and other equitable remedies. (§ 1871.7, subd. (b).) An interested person who brings a successful section 1871.7 action is entitled to a percentage of the proceeds thereof; the percentage allowed ranges from 30 to 50 percent depending on whether the district attorney or insurance commissioner intervenes and proceeds with the action. (§ 1871.7, subd. (g)(1)(A) & (2)(A).) In addition, pursuant to section 1871.1, subdivision (g)(2)(B), "If the person bringing the action [in which the district attorney or Insurance Commissioner does not proceed], as a result of a violation of this section has paid money to the defendant or to an attorney acting on behalf of the defendant in the underlying claim, then he or she shall be entitled to up to double the amount paid to the defendant or the attorney if that amount is greater than 50 percent of the proceeds. That person shall also receive an amount for reasonable expenses that the court finds to have been necessarily incurred, plus reasonable attorney's fees and costs. All of those expenses, fees, and costs shall be awarded against the defendant."

█ Of specific relevance to the present proceeding, as noted above, subdivision (h)(2) imposes a jurisdictional bar to an action brought by an interested person that is based upon public disclosure of the fraud where that

individual or entity was not an original source of the information. Subdivision (h)(2) states: "(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing[,] in a legislative or administrative report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information. [¶] (B) For purposes of this paragraph, 'original source' means an individual who had direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the district attorney or [insurance] commissioner before filing an action under this section which is based on the information."

■ As pertinent here, there are two ways superior court jurisdiction in an insurance fraud qui tam action can be defeated under subdivision (h)(2). The first relevant way the jurisdictional bar occurs is when an insurance fraud qui tam plaintiff learns of the fraudulent conspiracy because of the "public disclosure of allegations or transactions . . . in a civil . . . hearing." (Subd. (h)(2)(A).) Defendants argue that the trial court correctly found it had no jurisdiction because Allstate learned of the fraudulent conspiracy from the first amended complaint in the Financial action. In this regard, defendants note that Allstate's lawyer drafted the first amended complaint in the Financial qui tam action. The second relevant way the jurisdictional bar can arise is when the insurance fraud qui tam plaintiff learns of the fraudulent conspiracy because of the "public disclosure of allegations or transactions . . . from the news media." (*Ibid.*) Defendants contend Allstate learned of the insurance fraud from news reports. A relevant exception to the jurisdictional bar found in subdivision (h)(2)(A) occurs if the qui tam plaintiff, other than the Attorney General, is the "original source . . . of the information." The term "original source" is defined in subdivision (h)(2)(B). Defendants argue that Allstate was not an "original source" because it did not have "direct and independent knowledge of the information on which the allegations are based." (*Ibid.*) Rather, defendants argue that Allstate's knowledge of the conspiracy arose from its own lawyer's representation in the Financial lawsuit and the press reports.

## C. *Legislative History of Section 1871.7*

As will be described, the legislative history of section 1871.7 shows the statute has been repeatedly amended specifically to authorize *and encourage* insurers to bring fraud actions under the section. The Legislature envisioned that automobile insurers, working with law enforcement agencies, could contribute to efforts to combat the prevalent and serious problem of automobile insurance fraud. The Legislature recognized that this approach benefits insurers, insureds, and government agencies without unnecessarily

burdening public resources. Because the legislative history is particularly illuminating in terms of the issues posited by the parties, we discuss it in some detail.

### 1. *1993*

Section 1871.7 was originally enacted in 1993 as a means to combat workers' compensation fraud. It did not then apply to automobile insurance fraud. The exact language currently found in subdivision (h)(2) was included in the bill as introduced. (Assem. Bill No. 1300 (1993-1994 Reg. Sess.) as introduced Mar. 3, 1993.) The bill was enacted with the subdivision (h)(2) language unchanged. (Stats. 1993, ch. 120, § 3.3, pp. 1233-1237, eff. July 16, 1993.) Committee reports that discuss Assembly Bill No. 1300 contain no specific analysis of subdivision (h)(2). The "bounty hunter" provisions in subdivision (g) of section 1871.7 as originally enacted, allowing interested persons to retain a percentage of the proceeds of successful actions against fraud perpetrators, were discussed in general terms. An Assembly Ways and Means Committee Analysis of Assembly Bill No. 1300, for example, described the bill as, among other things: "Authoriz[ing] the Attorney General and interested persons to bring a civil action for the crime of employing runners, cappers, steerers, or other persons to procure clients to obtain workers' compensation benefits. Imposes civil penalties, and provides awards for specified actions brought by individuals related to workers' compensation fraud." (Assem. Ways and Means Com., Analysis of Assem. Bill No. 1300 (1993-1994 Reg. Sess.) as amended Apr. 12, 1993, p. 2; see also Assem. Com. on Finance, Insurance and Public Investment, Analysis of Assem. Bill No. 1300 (1993-1994 Reg. Sess.) as amended Apr. 12, 1993, p. 3.)

### 2. *1994*

Section 1871.7 was amended in 1994, after its enactment, to extend its provisions to insurance fraud. (Assem. Bill No. 1926 (1993-1994 Reg. Sess.); Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1926 (1993-1994 Reg. Sess.) as amended Aug. 8, 1994, p. 2; Tim Hart, Assn. of Cal. Ins. Companies (ACIC), letter to Sen. Com. on Judiciary, Sen. David Roberti, Chair, Aug. 1, 1994, proposed amendments, p. 2; Sen. Com. on Judiciary, Background Information on Assem. Bill No. 1926 (1993-1994 Reg. Sess.) [undated]; Dept. of Finance, Analysis of Assem. Bill No. 1926 and Enrolled Bill Rep. (1993-1994 Reg. Sess.) as amended Aug. 12, 1992, p. 4 [Assem. Bill No. 1926 makes changes "directed at reducing insurance fraud"]; Sen. Rules Com., 3d reading analysis of Assem. Bill No. 1926 (1993-1994 Reg. Sess.) as amended Aug. 26, 1994, p. 1.) The Legislative Counsel's Digest

states: "Existing law provides that it is unlawful to knowingly employ runners, cappers, steerers, or other persons to procure clients or patients to perform or obtain services or benefits pursuant to specified workers' compensation provisions. . . . [¶] This bill would extend the applicability of that prohibition to certain crimes involving fraudulent claims against insurers, as specified, and make related changes." (Legis. Counsel's Dig., Assem. Bill No. 1926 (1993-1994 Reg. Sess.) 5 Stats. 1994, Summary Dig., p. 534.) The provisions relating to private enforcement remained unchanged. (Stats. 1994, ch. 1247, § 1, pp. 7841-7846.) Committee reports analyzing Assembly Bill No. 1926 contain no specific discussion of subdivision (h)(2).

The express purpose of the 1994 amendments was to deter fraudulent automobile insurance claims and to facilitate the investigation and prosecution of insurance fraud. The Assembly Committee on Finance, Insurance and Public Investment's analysis of Assembly Bill No. 1926 states in part: "The sponsor of this bill, Association of California Insurance Companies (ACIC), state that the proposed legislation is necessary to deter fraudulent auto insurance claims which have become a sophisticated and lucrative business in California. Specifically, the sponsor indicates that complex rings of dishonest lawyers, health professionals, 'cappers' and insureds conspire to defraud insurance companies and their customers of $100 million each year in and around the Los Angeles area alone. ACIC asserts that these losses are generated by staging accidents, filing claims for 'paper' accidents and padding medical and legal bills with treatment and services never rendered. In addition, theses criminals have mastered the claims system and insulated themselves inside layers of legal deniability. Convictions depend upon investigation and infiltration by trained law enforcement profession[al]s. Therefore, this legislation provides the necessary resources and mechanisms to . . . address vehicle fraud and theft." (Assem. Com. on Finance, Insurance and Public Investment, Analysis of Assem. Bill No. 1926 (1993-1994 Reg. Sess.) as amended Jan. 10, 1994, p. 2; Assem., 3d reading analysis of Assem. Bill No. 1926 (1993-1994 Reg. Sess.) as amended Jan. 31, 1994, p. 2.)

A Senate Judiciary Committee report similarly described the bill's purpose, "The purpose of this bill is to enact a comprehensive package of laws to assist in the prevention, identification, investigation, and prosecution of insurance fraud." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1926 (1993-1994 Reg. Sess.) as amended Aug. 8, 1994, p. 3.) In statements made before the Senate Judiciary Committee and the Senate Appropriations Committee, Senator Steven Peace, the bill's sponsor, declared that the bill had "one simple goal": "To help state and local law enforcement agencies *and insurers* to fight insurance fraud, without creating expensive new bureaucracies and breaking the bank in this tight budget year." (Statement of Sen.

Peace on Assem. Bill No. 1926 (1993-1994 Reg. Sess.) before the Sen. Com. on Judiciary, July 5 and Aug. 9, 1994, and the Sen. Com. on Appropriations, Aug. 25, 1994, italics added; see also Sen. Com. on Judiciary, Background Information on Assem. Bill No. 1926 (1993-1994 Reg. Sess.) p. 1 ["Objective of [bill] is to combat auto . . . insurance fraud while minimizing impact on state [and] local governments. The bill enhances tools for investigators [and] prosecutors in their fight against ins[urance] fraud"].)

### 3. *1995*

Section 1871.7 was amended in 1995, at the request of the Los Angeles County District Attorney, to address concerns relating to criminal prosecutions. (Sen., 3d reading analysis of Sen. Bill No. 465 (1995-1996 Reg. Sess.) as amended Aug. 29, 1995, p. 3 ["The sponsor is especially concerned that existing law may blur the line between civil and criminal actions, and result in determinations that defendants have been subjected to double jeopardy in violation of the U.S. Constitution"]; Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Sen. Bill No. 465 (1995-1996 Reg. Sess.) as amended Aug. 29, 1995, pp. 4-5; Assem. Com. on Appropriations, Analysis of Sen. Bill No. 465 (1995-1996 Reg. Sess.) as amended Aug. 21, 1995, p. 1.) In addition, the statute was amended to require that section 1871.7 awards allocated to government agencies be used for the investigation and prosecution of fraud. (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 465 (1995-1996 Reg. Sess.) as amended June 29, 1995, p. 1, and as amended Aug. 21, 1995, p. 1; Assem. Com. on Judiciary, Analysis of Sen. Bill No. 465 (1995-1996 Reg. Sess.) as amended May 30, 1995, p. 9 ["To preclude a district attorney or a County Board of Supervisors from using civil proceeds from insurance fraud cases for purposes unrelated to the investigation and prosecution of insurance fraud, the bill dedicates those proceeds to insurance fraud efforts . . . ."]; Sen. Com. on Criminal Procedure, Analysis of Sen. Bill No. 465 (1995-1996 Reg. Sess.) as introduced, p. 6.) Further, Senate Bill No. 465 expanded the description of insurance fraud violations from "It is unlawful to knowingly employ runners, cappers, steerers, or other persons . . . for the purpose of engaging in activities prohibited by Section 549, 550, or 551 of the Penal Code [insurance fraud]" to "It is unlawful to knowingly employ runners, cappers, steerers, or other persons . . . to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer. . . ." (Stats. 1995, ch. 574, § 2, pp. 4427-4432; Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Sen. Bill No. 465 (1995-1996 Reg. Sess.) as amended Apr. 6, 1995, pp. 1-2, and as amended Aug. 29, 1995, pp. 1-2; Sen. Com. on Criminal Procedure, Analysis of Sen. Bill No. 465 (1995-1996 Reg. Sess.) as introduced, p. 2.)

Moreover, pursuant to the 1995 amendment of section 1871.7, an interested person's share of the proceeds of a successful action was increased "from a maximum of 30% of the proceeds to up to double the amount" paid by the victim. (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 465 (1995-1996 Reg. Sess.) as amended May 30, 1995, p. 6; see also, Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Sen. Bill No. 465 (1995-1996 Reg. Sess.) as amended Apr. 6, 1995, p. 3, and as amended Aug. 29, 1995, p. 3; Assem. Com. on Appropriations, Analysis of Sen. Bill No. 465 (1995-1996 Reg. Sess.) as amended June 29, 1995, p. 1; Sen. Com. on Criminal Procedure, Analysis of Sen. Bill No. 465 (1995-1996 Reg. Sess.) as introduced, p. 3.) Section 1871.1, subdivision (g)(2)(B), was amended to provide, "If the person bringing the action has paid money to the defendant as a result of a violation of this section, then he or she shall be entitled to up to double the amount paid to the defendant if that amount is greater than 30 percent of the proceeds." (Stats. 1995, ch. 574, § 2, p. 4430.) The purpose of these changes was "to provide additional tools to be used in response to insurance fraud . . . ." (Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Sen. Bill No. 465 (1995-1996 Reg. Sess.) as amended Apr. 6, 1995, p. 4, and as amended Aug. 29, 1995, p. 4; Sen. Com. on Criminal Procedure, Analysis of Sen. Bill No. 465 (1995-1996 Reg. Sess.) as introduced, p. 4.) An Assembly Judiciary Committee analysis noted: "The Department of Insurance has reported that the dollar loss due to automobile insurance fraud in Los Angeles County alone was in excess of $100 million in 1993. Insurers estimate that insurance premiums are increased for all lines of insurance on an average of 10%-15% due to fraudulent claims." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 465 (1995-1996 Reg. Sess.) as amended May 30, 1995, p. 1.)

### 4. *1999*

Assemblymember Roderick Wright introduced legislation in 1999 to further amend section 1871.7. Assemblymember Wright's purpose was to enhance and reform efforts to combat automobile insurance fraud. The proposed amendments were designed to encourage insurers to bring section 1871.7 actions. (See, e.g., Assem., 3d reading analysis of Assem. Bill No. 1050 (1999-2000 Reg. Sess.) as amended May 19, 1999, p. 1.) As reflected in an Assembly committee report, Assemblymember Wright stated in support of the bill: " 'According to the National Insurance Crime Bureau, approximately 20% of all automobile-insurance claims are fraudulent. In my district and other parts of Southern California this figure is as high as 50% despite the efforts of law enforcement, the [D]epartment of [I]nsurance and insurers.' " (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1050 (1999-2000 Reg. Sess.) as proposed to be amended after Apr. 27, 1999, p. 3.)

Assembly Bill No. 1050 as introduced would have increased the share of the proceeds of an *insurer,* as distinguished from other interested persons, bringing a successful civil action from between 15 and 30 percent to between 75 and 95 percent. (Assem. Bill No. 1050 (1999-2000 Reg. Sess.) as amended Apr. 19, 1999; Assem Com. on Judiciary, Analysis of Assem. Bill No. 1050 (1999-2000 Reg. Sess.) as proposed to be amended after Apr. 27, 1999, p. 3 ["[T]he bill differentiated between an insurer who brought an action for a violation of this section and any other interested person who brought the same action, a distinction not in current law"]; Assem. Com. on Insurance, Analysis of Assem. Bill No. 1050 (1999-2000 Reg. Sess.) as amended Apr. 19, 1999, p. 1.) Specifically, the author sought to dramatically increase the proceeds going to *insurers* that bring civil actions, "Since the insurer has done the work on the case, the author believes it should be eligible to the proceeds." (Assem. Com. on Insurance, Analysis of Assem. Bill No. 1050 (1999-2000 Reg. Sess.) as amended Apr. 19, 1999, p. 2; Assem., 3d reading analysis of Assem. Bill No. 1050 (1999-2000 Reg. Sess.) p. 2; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1050 (1999-2000 Reg. Sess.) as amended Sept. 3, 1999, p. 6.) The author believed this amendment would encourage more insurers to pursue civil actions under section 1871.7. (Assem. Com. on Insurance, Analysis of Assem. Bill No. 1050 (1999-2000 Reg. Sess.) as amended Apr. 19, 1999, p. 2; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1050 (1999-2000 Reg. Sess.) as amended Sept. 3, 1999, p. 6.)

The proposed increased share of proceeds to insurers was subsequently reduced to between 30 and 50 percent. (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1050 (1999-2000 Reg. Sess.) as proposed to be amended after Apr. 27, 1999, p. 1.) As explained in a analysis by the Assembly Committee on the Judiciary: "As brought to this Committee, the bill adjusted the formula for the distribution of proceeds recovered from a settlement or judgment by potentially tripling the percentage the insurer would receive. Supporters of the bill believed this to be an effective way in which to encourage insurers to pursue claims of insurance fraud. Because of strong concerns expressed by the Committee staff about the overwhelming increase in the percentage of proceeds that an insurer would receive, the author has agreed, after extensive negotiations with the Committee staff and other parties, to adopt a more modest approach. . . . [¶] The approach adopted by the author continues to combat insurance fraud by encouraging insurers to pursue claims of insurance fraud. The approach seeks to balance this important goal with the objective of ensuring that insurers are not provided with a windfall as the result of a significant increase in the percentage of proceeds they would be able to collect. . . . [¶] The author's goal of reducing insurance fraud is a worthy one." (*Id.* at p. 2.)

In addition, the Legislature dropped the provision singling out insurers, as distinguished from other interested persons, for increased percentages of recovery. An Assembly Judiciary Committee report stated, "Because of concerns about the substantial re-distribution of proceeds, and the bill's earlier language providing that the percentage change would not be shared equally with other interested parties who might bring an action, the author agreed to delete the language providing for a special increase specifically for insurers . . . and to modify the distribution of proceeds." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1050 (1999-2000 Reg. Sess.) as proposed to be amended after Apr. 27, 1999, p. 3.)

In addition to increasing the percentage of recovery by interested persons, Assembly Bill No. 1050 amended section 1871.7, subdivision (e)(1) to read as it does now: "Any interested person, *including an insurer,* may bring a civil action for a violation of this section . . . ." (Stats. 1999, ch. 885, § 2.) Further, section 1871.7, subdivision (b) was amended to *add,* "The [$5,000 to $10,000] penalty prescribed in this paragraph shall be assessed for each fraudulent claim presented to an insurance company by a defendant and not for each violation." (Stats. 1999, ch. 885, § 2.)

In enacting Assembly Bill No. 1050, the Organized Crime Prevention and Victim Protection Act of 1999 (Stats. 1999, ch. 885, § 1), the Legislature found: "[O]rganized automobile fraud activity operating in the major urban centers of the state represents a significant portion of all individual fraud-related automobile insurance cases. These cases result in artificially higher insurance premiums for core urban areas and low-income areas of the state than for other areas of the state. Only a focused, coordinated effort by all appropriate agencies and organizations can effectively deal with this problem." (*Ibid.*)

### D. *The Federal False Claims Act*

The language in subdivision (h)(2) is not unique to section 1871.7. Similar language is found in a section of the federal False Claims Act (31 U.S.C. § 3729 et seq.). Title 31 of the United States Code section 3730(e)(4)(A) states: "No court shall have jurisdiction over an action under this section *based upon* the *public disclosure* of *allegations or transactions* in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an *original source* of the information." (Italics added.) For purposes of the federal False Claims Act, an "original source" is defined as follows, " '[O]riginal source' means an individual who has direct

and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." (31 U.S.C. § 3730(e)(4)(B).)

The original federal False Claims Act, also known as Lincoln's Law, was enacted in 1863. (*Minnesota Ass'n of Nurse Anesthetists v. Allina* (8th Cir. 2002) 276 F.3d 1032, 1040; *U.S. v. Hercules, Inc.* (D.Utah 1996) 929 F.Supp. 1418, 1420.) The legislative development of title 31 of the United States Code section 3730(e)(4)(A) and (B) was traced in *Minnesota Ass'n of Nurse Anesthetists v. Allina, supra,* 276 F.3d at page 1041 as follows: "The original [federal] False Claims Act was enacted in 1863 in order to strike back against the fraud of unscrupulous Civil War defense contractors. S.Rep. No. 99-345, at 8 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5273. The Act contained a qui tam provision allowing private persons to sue as relators representing the government's interests, and it rewarded relators who prevailed in their suits with a bounty of half the damages and forfeitures they recovered for the government. *Id.* at 10." (Fns. omitted; see Gilles, *Reinventing Structural Reform Litigation; Deputizing Private Citizens in the Enforcement of Civil Rights* (2000) 100 Colum. L.Rev. 1384, 1422, fn. 157 ["Congress enacted the original [federal] Claims Act 'to assist in ferreting out unscrupulous defense contractors who committed fraud against the Union army . . . .' "].) The 1863 statute did not require that the realtor have "first-hand knowledge" of the fraudulent conduct. (McGreal, *Applying Coase To Qui Tam Actions Against The States* (2001) 77 Notre Dame L.Rev. 87, 124; Act of Mar. 2, 1863, ch. 67, 12 Stat. 696.) Rather, the False Claims Act, as adopted in 1863, permitted the relator to bring suit based on publicly available information. (Rabecs, *Kickbacks As False Claims: The Use of the Civil False Claims Act to Prosecute Violations of the Federal Health Care Program's Anti-kickback Statute* (2001) 2001 Mich. St. U. Det. C. L.Rev. 1, 36, fn. 116; Morgan, *The Last Privateers Encounter Sloppy Seas: Inconsistent Original-Source Jurisprudence Under the Federal False Claims Act* (1998) 24 Ohio N.U. L.Rev. 163, 169.)

In 1943, the False Claims Act was amended to prevent the relator from suing based solely upon publicly available information. The 1943 amendment was described by the Eighth Circuit Court of Appeals as follows: "During World War II there were many qui tam cases against defense contractors, and in one notorious case, *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), the government contended that the relator had simply copied allegations from a criminal indictment already on file. The Supreme Court held that, even if the relator, Marcus, had simply taken allegations from a criminal indictment, the False Claims

Act would nevertheless permit him to proceed as relator. *Id.* at 545 [63 S.Ct. at pp. 384-385]. In reaction to *Hess,* Attorney General Francis Biddle asked Congress to repeal the qui tam provisions of the [federal] False Claims Act. S.Rep. No. 99-345, at 11. Congress refused to go so far, but it did amend the Act to provide that there would be no jurisdiction over qui tam suits 'whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought.' 31 U.S.C. § 232(C) (1946); S.Rep. No. 99-345, at 12. The provision was explained as an attempt to curtail parasitical suits in which the informer 'rendered no service' to the government. 89 Cong. Rec. 10846 (1943). In *United States ex rel. Wisconsin v. Dean,* 729 F.2d 1100 (7th Cir. 1984), the State of Wisconsin brought a qui tam suit based on Medicaid fraud that it had already disclosed to the federal government. The Seventh Circuit, interpreting the 1943 amendment, held that even though the discovery of the fraud was entirely due to the State's investigation, qui tam jurisdiction was barred because the federal government knew of the fraud before Wisconsin filed suit. *Id.* at 1104-07." (*Minnesota Ass'n of Nurse Anesthetists v. Allina, supra,* 276 F.3d at p. 1041, fn. omitted; see Comment, *The False Claims Act* (1994) 26 Ariz. St. L.J. 899, 901-902; Pub.L. No. 78-213 (Dec. 23, 1943) 57 Stat. 608, 609.)

As a result of the Seventh Circuit Court of Appeals *Dean* decision, events unfolded which led to the 1986 amendments to the False Claims Act. The Eighth Circuit described the congressional reaction to the *Dean* decision as follows: "Within months of the *Dean* decision, the National Association of Attorneys General adopted a resolution urging Congress 'to rectify the unfortunate result of the *Wisconsin v. Dean* decision.' S.Rep. No. 99-345, at 13. Congress responded. Senate Bill 1562, which became the 1986 False Claims Amendments Act, was introduced shortly after and was 'aimed at correcting restrictive [court] interpretations' of the False Claims Act which 'tend to thwart the effectiveness of the statute.' *Id.* at 4, 13. The goals of the 1986 Amendments Act were (1) to encourage those with information about fraud against the government to bring it into the public domain; (2) to discourage parasitic qui tam actions by persons simply taking advantage of information already in the public domain; and (3) to assist and prod the government into taking action on information that it was being defrauded. *United States ex rel. Mistick PBT v.[Housing Authority],* 186 F.3d 376, 401 (3d Cir. 1999) (Becker, C.J., dissenting) (citing S.Rep. No. 99-345, at 1-8, 23-24), *cert. denied,* 529 U.S. 1018, 120 S.Ct. 1418, 146 L.Ed.2d 310 (2000). [¶] . . . [¶] The 1986 Act also added an important exception to the jurisdictional bar for relators who are 'an original source of such information.' The relevant section is 31 U.S.C. § 3730(e)(4) [.]" (*Minnesota Ass'n of Nurse Anesthetists v. Allina, supra,* 276 F.3d at p. 1041, fns. omitted; see also *U.S. ex rel. Doe v. John Doe Corp.* (2d Cir. 1992) 960 F.2d 318, 321-322.)

## E. *The Federal Courts of Appeals Authority*

The parties have extensively briefed the conflicting decisions concerning public disclosure and the original source rule issued by the federal circuit courts. The federal circuits have expressed widely varying views as to public disclosure and original source issues as they relate to the jurisdictional bar in federal False Claims Act litigation. Some of those views support Allstate's position; other perspectives support defendants' side of the dispute.

For example, the First Circuit Court of Appeals has articulated the following test: "Thus, when it is not clear whether or not a qui tam action should be barred by the ambiguous provision precluding the action if it is 'based upon transactions or allegations which are the subject of' another suit or proceeding in which the government is a party, we think that a court should look first to whether the two cases can properly be viewed as having the qualities of a host/parasite relationship. In answering this question, we think it would be useful for the court to be guided by the definition of the word 'parasite,' and ask whether the qui tam case is receiving 'support, advantage, or the like' from the 'host' case (in which the government is a party) 'without giving any useful or proper return' to the government (or at least having the potential to do so). See Random House Dictionary of the English Language 1409 (2d ed. unabridged 1987). If this question is answered in the affirmative, the court may properly conclude that there is an identity between 'the basis' of the qui tam action and 'the subject of' the other suit or proceeding; if this question is answered in the negative, the court similarly may gather that such an identity is lacking." (*U.S. ex rel. S. Prawer and Co. v. Fleet Bank* (1st Cir. 1994) 24 F.3d 320, 327-328, italics omitted.) The First Circuit perspective is supportive of Allstate's position.

The Second Circuit Court of Appeals rule, which engrafts a requirement that the qui tam plaintiff have been the source of public disclosure to the entity which publicly discloses the evidence of fraud, is as follows: "[W]e note that 'original source' is expressly defined in § 3730(e)(4)(B). A straightforward reading of § 3730(e)(4)(B) indicates that to be an 'original source' a qui tam plaintiff must (1) have direct and independent knowledge of the information on which the allegations are based, and (2) have voluntarily provided such information to the government prior to filing suit. A close textual analysis combined with a review of the legislative history convinces us that under § 3730(e)(4)(A) there is an additional requirement that a qui tam plaintiff must meet in order to be considered an 'original source,' namely, *a plaintiff also must have directly or indirectly been a source to the entity that publicly disclosed the allegations on which a suit is based.*" (*U.S. ex rel. Kreindler v. United Technologies* (2d Cir. 1993) 985 F.2d 1148,

1158-1159, italics added and omitted; accord, *U.S. ex rel. Dick v. Long Island Lighting Co.* (2d Cir. 1990) 912 F.2d 13, 16 [because the relators were not the source of the allegations in the first lawsuit, they did not qualify as original sources].) Also, in *Kreindler,* the plaintiff argued that it did not obtain the "pertinent information 'solely'" from publicly disclosed material but that it also conducted an independent investigation. The Second Circuit, citing *U.S. ex rel. Precision Co. v. Koch Industries* (10th Cir. 1992) 971 F.2d 548, 543, held that a "qui tam action . . . based *in any part* upon publicly disclosed allegations or transactions" would be barred. (*U.S. ex rel. Kreindler v. United Technologies, supra,* 985 F.2d at p. 1158, italics added and omitted.) Defendants quite obviously rely on the Second Circuit position articulated in *Kreindler.*

The Third Circuit Court of Appeals takes a broader view than the Second Circuit of when a qui tam plaintiff may pursue a fraud claim after public disclosure of misconduct. The Third Circuit rule is as follows: "[A] relator's action is 'based upon' a public disclosure of allegations only where the relator has actually derived from that disclosure the allegations upon which his qui tam action is based. Such an understanding of the term 'based upon,' apart from giving effect to the language chosen by Congress, is fully consistent with section 3730(e)(4)'s undisputed objective of preventing 'parasitic' actions *see, e.g.,* [*U.S. ex rel. Stinson v. Prudential Ins.* (3d Cir. 1991) 944 F.2d 1149,] 1154 [117 A.L.R.Fed. 679], for it is self-evident that a suit that includes allegations that happen to be similar (even identical) to those already publicly disclosed, but were not actually derived from those public disclosures, simply is not, in any sense, parasitic. *Id.*" (*U.S. ex rel. Mistick PBT v. Housing Authority, supra,* 186 F.3d at pp. 385-386.) The Third Circuit analysis is supportive of Allstate's position.

The Fourth Circuit Court of Appeals has adopted an entirely different perspective from other circuits as to the relationship between the publicly disclosed matters and the qui tam complaint's factual allegations. In *U.S. ex rel. Siller v. Becton Dickinson & Co.* (4th Cir. 1994) 21 F.3d 1339, 1348, the court held: "[T]herefore, a relator's action is 'based upon' a public disclosure of allegations only where the relator has actually derived from that disclosure the allegations upon which his qui tam action is based. Such an understanding of the term 'based upon,' apart from giving effect to the language chosen by Congress, is fully consistent with section 3730(e)(4)'s undisputed objective of preventing 'parasitic' actions, *see, e.g.,* [*U.S. ex rel. Stinson v. Prudential Ins., supra,* 944 F.2d] at 1154, for it is self-evident that a suit that includes allegations that happen to be similar (even identical) to those already publicly disclosed, but were not actually derived from those public disclosures, simply *is not, in any sense,* parasitic." (Italics omitted.) Both Allstate and defendants rely on the Fourth Circuit rule.

The Fifth Circuit Court of Appeals has adopted a very restrictive original source test, one defendants strongly support. In *Federal Recovery Services, Inc. v. U.S.* (5th Cir. 1995) 72 F.3d 447, 451, ambulance company executives filed suit in state court alleging a competitor engaged in unfair business practices. The executives then formed a new corporation and filed a qui tam suit in federal court based on the exact same unfair business practices as were pursued in the state court action. But in the qui tam suit, the plaintiffs added additional unfair business practices claims. The Fifth Circuit held that if a qui tam action was even partly based upon publicly disclosed allegations, the district court had no jurisdiction under the False Claims Act. The Fifth Circuit held: " '[A]n FCA qui tam action *even partly based upon* publicly disclosed allegations or transactions is nonetheless "based upon" such allegations or transaction.' *United States ex rel. Precision Co. v. Koch Industries,* [*supra,*] 971 F.2d [at p.] 552, cert. denied, 507 U.S. 951, 113 S.Ct. 1364, 122 L.Ed.2d 742 (1993); see also *Cooper* [*v. Blue Cross and Blue Shield of Florida* (11th Cir.1994) 19 F.3d 562,] 567 (holding that 31 U.S.C. § 3730(e)(4) 'preclude[s] suits based in any part on [publicly] disclosed information'). As the Tenth Circuit acknowledged, Congress chose not to insert the adverb 'solely' before 'based upon,' yet to hold as [plaintiff] urges would accomplish exactly that result and alter the statute's plain meaning. [*United States ex rel. Precision Co. v.*]*Koch* [*Industries, supra,*] 971 F.2d at 552. Stated another way, [plaintiff] cannot avoid the jurisdictional bar simply by adding other claims that are substantively identical to those previously disclosed in the state court litigation." (*Federal Recovery Services, Inc. v. U.S., supra,* 72 F.3d at p. 451, original italics.) The Sixth, Eighth, Tenth, and Eleventh Circuits have also held that that if a False Claim Act qui tam action is even *partly* based upon publicly disclosed allegations, then the complaint must be dismissed unless the plaintiff is an original source. (*Minnesota Ass'n of Nurse Anesthetists v. Allina, supra,* 276 F.3d at p. 1045, fn. 9; *U.S. ex rel. McKenzie v. Bellsouth Tel.* (6th Cir. 1997) 123 F.3d 935, 940; *U.S. ex rel. Precision Co. v. Koch Industries, supra,* 971 F.2d at p. 552.) Defendants quite obviously rely on these opinions as they do on the previously discussed Second Circuit analysis in *U.S. ex rel. Kreindler v. United Technologies, supra,* 985 F.2d at page 1158.

The Seventh Circuit has clarified that a qui tam plaintiff can be an original source even if most of the facts underlying the fraud have been publicly disclosed. Even if there has been public disclosure of key facts, in the Seventh Circuit's view, if the qui tam plaintiff identifies how the circumstances amount to a fraud, then the original source jurisdictional bar is inapplicable. In *U.S. v. Bank of Farmington* (7th Cir. 1999) 166 F.3d 853, 864, the court described how a plaintiff can still be an original source even in the face of significant prior public disclosure of factual matters pertinent

to the fraud: "Mathews argues that she is an original source under *Houck* because, while some pieces of her story of fraudulent conduct by the Bank may have been dependent on public disclosures, her contribution was to reveal the entire pattern of the fraud. All the facts from various sources came together in her lawyer's office, she says, before she caused the facts to be placed in the public domain. The hidden pattern she revealed is what was independent of public disclosure. Fair enough—in theory. In an exceptionally or unusually complicated allegation of fraud each piece of the information may be publicly disclosed, yet the fraud itself may remain hidden until some perspicacious plaintiff puts it in perspective. We acknowledge that in such a case, a plaintiff might be an original source even though her knowledge of every isolated element of the fraud is based upon public disclosures. Mathews, however, is not such a plaintiff." The Seventh Circuit noted that the plaintiff in that case did not engage in any significant development of facts apart from those which had previously been publicly disclosed. The Seventh Circuit continued: "This was no profound scheme. It would not take Sherlock Holmes to figure it out. . . . We cannot say in advance how complex a fraud must be, or how deep or clever its revelation, to satisfy the original source requirement when the claim is based on information which has been publicly disclosed. But the misrepresentation Mathews revealed, and the difficulty involved in its unveiling, falls well short of the mark. Putting 'two and two together,' as Mathews says she did, will not do." (*Id.* at pp. 864-865.) It is apparent the Seventh Circuit believes that in the case of a complex fraudulent conspiracy, even in the face of disclosure of many facts concerning the unlawful conduct, a qui tam plaintiff who puts the factual circumstances together may pursue a False Claims Act lawsuit.

The Ninth Circuit Court of Appeals in *Wang v. FMC Corp.* (9th Cir. 1992) 975 F.2d 1412, 1415-1417, confronted a case similar to the present one. The qui tam plaintiff sued his former employer claiming that it defrauded the government in four separate projects. The Ninth Circuit noted that neither the allegations nor the evidence of fraud had previously been publicly disclosed in *three* of the *four* projects identified in the qui tam complaint. Hence, as to three of the four projects which had not previously been publicly disclosed, those matters could be pursued in the qui tam action. Later, in *U.S. ex rel. Found. Aiding the Elderly v. Horizon* (9th Cir. 2001) 265 F.3d 1011, 1015-1016, two prior lawsuits had revealed instances of fraud, but not the particular fraudulent conduct appearing in the subsequently filed qui tam action. The Ninth Circuit panel concluded the public disclosure jurisdictional bar was therefore inapplicable to the qui tam action. (*Ibid.*) Allstate obviously relies on *Wang* which does support its position as well as the *Horizon* decision.

The District of Columbia Circuit Court of Appeals applies a test that is subtly different from others but which probably works to defendants' benefit. The District of Columbia Circuit synthesized its public disclosure rule

as follows: "We acknowledge that 'Congress did not prescribe by mathematical formulae the quantum or centrality of nonpublic information that must be in the hands of the qui tam relator in order for suits to proceed.' [Citation.] Nevertheless, it is our task to ensure that 'qui tam suits are limited to those in which the relator has contributed significant independent information . . . .' [Citation.] The Act triggers the jurisdictional bar only when there has been a public disclosure of 'allegations or transactions,' which it explicitly refers to in the disjunctive. [Citation.] The term ' "allegation" connotes a conclusory statement implying the existence of provable supporting facts.' [Citation.] The term ' "transaction" suggests an exchange between two parties or things that reciprocally affect or influence one another.' [Citation.] We illustrated the meaning of these terms in [*U.S. ex rel. Springfield Terminal* [*Ry. v. Quinn* (D.C. Cir. 1994)] 14 F.3d [645,] 654, with the following equation: X (misrepresented state of facts) + Y (true state of facts) = Z (fraud). X and Y represent the material elements of fraud; 'a qui tam action cannot be sustained where all of the material elements of the fraudulent transaction are already in the public domain . . . .' [Citation.] When the publicly disclosed transaction is sufficient to raise the inference of fraud (X + Y are in the public domain), there is 'little need for qui tam actions, which tend to be suits that the government presumably has chosen not to pursue or which might decrease the government's recovery in suits it has chosen to pursue.' [Citation.]" (*U.S. ex rel. Findley v. FPC-Boron Employees' Club* (D.C. Cir. 1997) 105 F.3d 675, 686-687, italics omitted.) As will be noted, this is a slightly different public disclosure test than others which more strongly support defendants' position.

Federal decisional authority is in hopeless conflict. (DeVecchio, *Qui Tam Actions: Some Practical Considerations* (2001) SG013 ALI-ABA 399, 405 [" 'There seems to be no unanimity both among and within individual circuits as to when claims are "based upon" public disclosures, what constitutes a public disclosure, when and under what circumstances a qui tam relator must first inform the government of the claims, the extent of the factual information that must be provided to the government . . . [,] when a qui tam action must be filed where there has been a public disclosure, what are the requisites to be classified as an "original source," when a claim is "primarily based upon" prior public disclosures and many other issues that arise under the statute,' " quoting *U.S. ex rel. Merena v. SmithKline Beecham Corp.* (E.D.Pa. 2000) 114 F.Supp.2d 352, 371]; Selden & Sharff, Jr., *Battling David and Goliath—Defending Qui Tam Lawsuits Brought Under the False Claims Act* (2001) 62 Ala. Law. 327, 329 ["the case law in this area is extensive and varies from circuit to circuit"]; Grimaldi & Manos, *Pretrial Motions Under The False Claims Act* (Summer 2000) 29 Pub. Cont. L.J. 693, 694 ["The law in this area is dynamic and rapidly changing, with splits

among the federal appellate courts on virtually every imaginable issue"].) The test articulated by the Second, Fifth, Sixth, Eighth, Tenth, and Eleventh Circuits (the qui tam suit is precluded even if it has been partially premised upon previously publicly disclosed information) supports defendants' position. On the other hand, the First and Third Circuits' analysis, which allows some similarity between the qui tam claim and the previously publicly disclosed allegations, is supportive of Allstate's position. Moreover, the Seventh Circuit acknowledges that in a complicated fraud case when the "perspicacious plaintiff" puts the pertinent facts in perspective, a prior public disclosure that does not reveal a hidden pattern of fraud does not bar a qui tam action. (*U.S. v. Bank of Farmington, supra,* 166 F.3d at pp. 864-865.) Also, the Ninth Circuit has held that when there has been public disclosure of one fraudulent series of transactions but three others remained unpublicized, all by the same defendant, the public disclosure bar of the False Claims Act does not jurisdictionally prevent prosecution of a qui tam lawsuit as to the nondisclosed fraud—a conclusion that squarely supports Allstate's position. (*Wang v. FMC Corp., supra,* 975 F.2d at pp. 1415-1417.)

Finally, we have carefully examined the facts in each of the federal appellate court decisions since the adoption of the 1986 amendments to the False Claims Act. Although the Ninth Circuit *Wang* decision is close, none of the facts in the circuit court decisions parallel those in the present case.[3]

---

[3]We have reviewed the following cases which discuss the "original source," or "public disclosure," and related elements of the federal False Claims Act. Other than the Ninth Circuit opinion in *Wang v. FMC Corp., supra,* 975 F.2d at pages 1415-1420, and to a lesser degree, *U.S. ex rel. Found. Aiding the Elderly v. Horizon, supra,* 265 F.3d at pages 1015-1016, none involve a factual scenario substantially similar to that of the present case. (*U.S. ex rel. S. Prawer and Co. v. Fleet Bank, supra,* 24 F.3d at pp. 326-328; *U.S. ex rel. LeBlanc v. Raytheon Co.* (1st Cir. 1990) 913 F.2d 17, 19-20; *U.S. v. New York Medical College* (2d Cir. 2001) 252 F.3d 118, 120-122; *U.S. ex rel. Kreindler v. United Technologies, supra,* 985 F.2d at pp. 1157-1159; *U.S. ex rel. Doe v. John Doe Corp., supra,* 960 F.2d at pp. 321-324; *U.S. ex rel. Dick v. Long Island Lighting Co., supra,* 912 F.2d at pp. 16-18; *U.S. ex rel. Mistick PBT v. Housing Authority, supra,* 186 F.3d at pp. 382-389; *U.S. ex rel. Dunleavy v. County of Delaware* (3d Cir. 1997) 123 F.3d 734, 739-746; *U.S. ex. rel. Stinson v. Prudential Ins., supra,* 944 F.2d at pp. 1157-1161; *Grayson v. Advanced Management Tech.* (4th Cir. 2000) 221 F.3d 580, 582-583; *Eberhardt v. Integrated Design & Const., Inc.* (4th Cir. 1999) 167 F.3d 861, 870; *U.S. ex rel. Siller v. Becton Dickinson & Co., supra,* 21 F.3d at pp. 1347-1355; *Federal Recovery Services, Inc. v. U.S., supra,* 72 F.3d at pp. 450-452; *U.S. v. A.D. Roe Co., Inc.* (6th Cir. 1999) 186 F.3d 717, 722-726; *U.S. ex rel. Jones v. Horizon Healthcare Corp.* (6th Cir. 1998) 160 F.3d 326, 330-335; *U.S. ex rel. McKenzie v. Bellsouth Tel., supra,* 123 F.3d at pp. 938-943; *U.S. ex rel. Lamers v. City of Green Bay* (7th Cir. 1999) 168 F.3d 1013, 1016-1018; *U.S. v. Bank of Farmington, supra,* 166 F.3d at pp. 859-866; *Hindo v. University of Health Sciences* (7th Cir. 1995) 65 F.3d 608, 613; *Houck on behalf of U.S. v. Folding Carton Admin.* (7th Cir. 1989) 881 F.2d 494, 504-505; *Minnesota Ass'n of Nurse Anesthetists v. Allina, supra,* 276 F.3d at pp. 1042-1051; *U.S. ex rel. Barth v. Ridgedale Elec., Inc.* (8th Cir. 1995) 44 F.3d 699, 702-704; *U.S. ex rel. Rabushka v. Crane Co.* (8th Cir. 1994) 40 F.3d 1509, 1511-1514;

The present case involves a prior public disclosure of a fraudulent conspiracy directed at Financial. Subsequently, Allstate, through its own intensive fraud investigation, determined that it too had been a victim. For these and other reasons, as will be noted, we conclude that the federal authority, although helpful, is not conclusive.

F. *Differences Between the Federal False Claims Act and Section 1871.7*

The federal False Claims Act differs from section 1871.7 in several significant respects. The goal of the federal statute is to recoup *government* funds lost through the fraud of federal contractors. In other words, when a federal contractor fraudulently overcharges the government, public monies are lost. The federal government is the direct victim. The taxpayers are the indirect victims. The federal act encourages whistleblowers to report contractor fraud. An action may be brought by a person with knowledge of the fraud. But that individual is not a direct victim of the fraud. The only direct victim is the federal government. Money recovered through a federal False Claims Act action is released to the national treasury. The relator recovers a bounty for bringing the fraud to light. If a federal contractor's fraud on the federal government were the subject of multiple federal False Claims Act proceedings, the amount of money recovered by the government would be diminished. The federal False Claims Act prevents this scenario from occurring by barring parasitic actions. A person cannot base a federal False Claims Act lawsuit on information learned through public channels and as to which she or he made no contribution. (*U.S. ex rel. Doe v. John Doe Corp.,*

*Seal 1 v. Seal A.* (9th Cir. 2001) 255 F.3d 1154, 1159-1163; *A-1 Ambulance Service, Inc. v. California* (9th Cir. 2000) 202 F.3d 1238, 1243-1245; *U.S. v. Alcan Elec. and Engineering, Inc.* (9th Cir. 1999) 197 F.3d 1014, 1018-1021; *U.S. ex rel. Newsham v. Lockheed Missiles* (9th Cir. 1999) 190 F.3d 963, 969-970; *U.S. ex rel. Aflatooni v. Kitsap Physicians Services* (9th Cir. 1999) 163 F.3d 516, 520-526; *U.S. v. Hughes Aircraft Co.* (9th Cir. 1998) 162 F.3d 1027, 1032-1034; *U.S. ex rel. Biddle v. Board of Trustees of Leland* (9th Cir. 1998) 161 F.3d 533, 535-540; *U.S. ex rel. Devlin v. State of Cal.* (9th Cir. 1996) 84 F.3d 358, 360-363; *Hagood v. Sonoma County Water Agency* (9th Cir. 1996) 81 F.3d 1465, 1472-1476; *U.S. ex rel. Fine v. Chevron, U.S.A., Inc.* (9th Cir. 1995) 72 F.3d 740, 743-745; *U.S. ex rel. Lindenthal v. General Dynamics Corp.* (9th Cir. 1995) 61 F.3d 1402, 1408-1410; *U.S. v. Northrop Corp.* (9th Cir. 1993) 5 F.3d 407, 409-412; *U.S. ex rel. Hagood v. Sonoma County Water Agency* (9th Cir. 1991) 929 F.2d 1416, 1419-1420; *U.S. ex rel. Stone v. Rockwell Intern. Corp.* (10th Cir. 2002) 282 F.3d 787, 797-803; *U.S. ex rel. King v. Hillcrest Health Center, Inc.* (10th Cir. 2001) 264 F.3d 1271, 1278-1281; *U.S. ex rel. Hafter v. Spectrum Emergency Care* (10th Cir. 1999) 190 F.3d 1156, 1160-1165; *U.S. ex rel. Fine v. MK-Ferguson Co.* (10th Cir. 1996) 99 F.3d 1538, 1544-1548; *U.S. ex rel. Fine v. Advanced Sciences, Inc.* (10th Cir. 1996) 99 F.3d 1000, 1003-1007; *U.S. ex rel. Ramseyer v. Century Healthcare Corp.* (10th Cir. 1996) 90 F.3d 1514, 1518-1522; *U.S. ex rel. Fine v. Sandia Corp.* (10th Cir. 1995) 70 F.3d 568, 570-572; *U.S. ex rel. Precision Co. v. Koch Industries, supra,* 971 F.2d at pp. 551-554; *Cooper v. Blue Cross and Blue Shield of Florida, supra,* 19 F.3d at pp. 565-568; *U.S. ex rel. Williams v. NEC Corp.* (11th Cir. 1991) 931 F.2d 1493, 1497-1501; *U.S. ex rel. Settlemire v. District of Columbia* (D.C. Cir. 1999) 198 F.3d 913, 918-920; *U.S. ex rel. Findley v. FPC-Boron Employees' Club, supra,* 105 F.3d at pp. 679-691; *U.S. ex rel. Springfield Terminal Ry. v. Quinn, supra,* 14 F.3d at pp. 651-657.)

*supra,* 960 F.2d at pp. 319, 321.) As the Second Circuit Court of Appeals explained in *John Doe Corp.*: "Because *qui tam* plaintiffs ('relators') are entitled to a portion of the proceeds of successful suits, there is the potential for parasitic lawsuits by those who learn of the fraud through public channels and seek remuneration although they contributed nothing to the exposure of the fraud. To discourage such chicanery, Congress carefully crafted a jurisdictional bar to *qui tam* claims that are based on publicly disclosed information." (*Id.* at p. 319.) The Second Circuit continued: "*Qui tam* suits by individuals seeking quick cash without assisting in exposing the fraud were aptly characterized by Attorney General Biddle, in 1943, as 'parasitic' actions. [Citation.]" (*Id.* at p. 321.)

The purpose of section 1871.7, on the other hand, is to prevent and remedy automobile insurance fraud. Insurers, not the state government, are the direct victims of the fraud. Insureds are the indirect victims who pay higher premiums due to the prevalence of insurance fraud. State and local governments, which generally are neither the principal direct nor indirect monetary victims of the fraud, recover funds pursuant to successful section 1871.7 actions. Section 1871.7 recoveries are earmarked for fraud prevention, investigation, and prosecution purposes. The government does not necessarily recover funds lost to it because of a fraud perpetrated on it. Further, section 1871.7 has been amended since it was initially extended to insurance fraud for the express purpose of *encouraging* automobile insurers to bring section 1871.7 actions. It is in the government's interest to have insurers investigate and prosecute such proceedings. The government serves to gain both in terms of fraud prevention and financially from such actions, especially given limited investigative and prosecutorial resources available to it. Moreover, for each such successful prosecution by an insurer-relator, the government recovers more, not less, money. The government's percentage share of the recovery is reduced when an insurer brings the section 1871.7 action and the government opts not to intervene. But the government is statutorily empowered to intervene in such actions, and when it does, its percentage of the proceeds is increased. Simply stated, there are material differences between the federal False Claims Act and section 1871.7.

### G. *Subdivision (h)(2) Does Not Bar Allstate's Claim*

Defendants argue we should follow federal precedent in construing the language of subdivision (h)(2). ■ The Supreme Court has held that, as a general rule: " ' "[W]hen legislation has been judicially construed and a subsequent statute on the same or an analogous subject is framed in the identical language, it will ordinarily be presumed that the Legislature intended that the language as used in the later enactment would be given a like

interpretation. This rule is applicable to state statutes which are patterned after the federal statutes. [Citations.]" ' " (*Keating v. Superior Court* (1982) 31 Cal.3d 584, 598 [183 Cal.Rptr. 360, 645 P.2d 1192], overruled on other grounds in *Southland Corp. v. Keating* (1984) 465 U.S. 1, 17 [104 S.Ct. 852, 861-862, 79 L.Ed.2d 1]; accord, *Snukal v. Flightways Manufacturing, Inc.* (2000) 23 Cal.4th 754, 766 [98 Cal.Rptr.2d 1, 3 P.3d 286].) Further, if the "objectives and relevant wording" of a federal statute are similar to a state law, California courts "often look to federal decisions" for assistance in interpreting this state's legislation. (*Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 812 [111 Cal.Rptr.2d 87, 29 P.3d 175]; *Reno v. Baird* (1998) 18 Cal.4th 640, 647 [76 Cal.Rptr.2d 499, 957 P.2d 1333].)

Yet, this rule of statutory interpretation may be different if there are varying circuit approaches to a federal statute. Under those circumstances, California courts decline to *always* follow federal decisions when construing a state statute which is similarly worded to a federal law. (*Richards v. CH2M Hill, Inc., supra*, 26 Cal.4th at pp. 822-823.) In *Richards*, the California Supreme Court explained this state's test for the continuing violation doctrine under the Fair Employment and Housing Act. As is often the case in addressing discrimination questions under the Fair Employment and Housing Act, the Supreme Court looked to the relevant federal decisional authority construing title VII of the Civil Rights Act of 1964. In *Richards*, the problem with simply adopting the federal courts' continuing violation doctrine analysis was that there was no single rule. The various circuits had adopted "essentially four approaches" to the continuing violation rule. (*Id.* at p. 813.) The California Supreme Court eventually adopted a modified test of the Fifth Circuit ruled articulated in *Berry v. Board of Sup'rs of L.S.U.* (5th Cir. 1983) 715 F.2d 971, 981. (*Richards v. CH2M Hill, Inc., supra*, 26 Cal.4th at pp. 823-824.) In adopting its modified continuing violation rule, the California Supreme Court examined the: relevant California decisional authority; the statutory objectives of the Fair Employment and Housing Act; and the practicalities involved in the application of the statute of limitations in the employment discrimination context. (*Id.* at p. 823.)

 We conclude the flexible approach identified in *Richards* ought likewise to be applied in this case involving a federal statute, the False Claims Act, and subdivision (h)(2). As in *Richards*, there is no consistency in federal decisional authority construing the "original source" rule resulting from the 1943 amendments to the False Claims Act. Further, as can be noted, there are material differences between the purposes and operation of the federal False Claims Act and section 1871.7. Moreover, given the widely divergent views taken by the federal circuits, it is injudicious for us to begin assigning a particular legislative intent to the California Legislature since

section 1871.7 was first adopted in 1993 in order to address workers' compensation fraud and during the subsequent amendatory process throughout the 1990's. Finally, there is *no* evidence of a legislative intent to adopt a particular circuit's perspective on the original source rule. Given the material differences between the purposes and operation of the False Claims Act as compared to section 1871.7, we decline to *entirely rely* on circuit court decisional authority construing the federal law.

But we follow federal precedent with respect to the general purpose of the jurisdictional bar—that is, to prevent qui tam actions brought by persons who, like the relator in *U.S. ex rel. Marcus v. Hess, supra,* 317 U.S. at page 548 [63 S.Ct. at page 386], simply copied allegations from a criminal indictment on file, learned of the specific fraudulent conduct at issue through public channels, and who had not contributed or assisted in a material way in exposing the fraud. (*U.S. v. Bank of Farmington, supra,* 166 F.3d at p. 863; *Wang v. FMC Corp., supra,* 975 F.2d at pp. 1415-1417.) The California Legislature, in adopting subdivision (h)(2), intended to bar parasitic or opportunistic actions by persons simply taking advantage of public information without contributing to or assisting in the exposure of the fraud. (*U.S. ex rel. Doe v. John Doe Corp., supra,* 960 F.2d at pp. 321-322; *Minnesota Ass'n of Nurse Anesthetists v. Allina, supra,* 276 F.3d at pp. 1040-1042; cf. *Rothschild v. Tyco Internat. (US), Inc., supra,* 83 Cal.App.4th at p. 499.)

■ As noted above, the pertinent language of subdivision (h)(2) is as follows: "(A) No court shall have jurisdiction over an action under this section based upon the *public disclosure* of *allegations or transactions* in a criminal, civil, or administrative hearing[,] in a legislative or administrative report, hearing, audit, or investigation, or from the news media, unless . . . the person bringing the action is an *original source* of the information. [¶] (B) For purposes of this paragraph, 'original source' means an individual who had direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the district attorney or [insurance] commissioner before filing an action under this section which is based on the information." (Italics added.) In determining legislative intent, we consider the meaning of the statutory language in accord with its purpose. (*Lakin v. Watkins Associated Industries, supra,* 6 Cal.4th at pp. 658-659; *Lungren v. Deukmejian, supra,* 45 Cal.3d at p. 735.) We find the meaning of the statutory language is clear. Further, applied to the present facts in light of its purpose, Allstate's complaint is not barred.

"Based upon" means supported by (Webster's Collegiate Dict. (10th ed. 1995) p. 94, col. 2), or resting on (Webster's New World Dict. (3d college

ed. 1991) p. 114, col. 2). "Public," as in "public disclosure" means "[o]pen or available for all to use . . . ." (Black's Law Dict., *supra,* p. 1242, col. 1.) An "allegation" is "[s]omething declared or asserted as a matter of fact" (Black's Law Dict., *supra,* p. 74, col. 2) or "a statement by a party to a legal action of what the party undertakes to prove" (Webster's Collegiate Dict., *supra,* p. 30, col. 1.) A "transaction" is "something transacted," "an exchange or transfer of goods, services, or funds," "an act, process, or instance of transacting," or "a communicative action or activity involving two parties or things that reciprocally affect or influence each other." (*Id.* at p. 1252, col. 2.)

Allstate's present action rests on and is supported by the facts and actions publicly disclosed in connection with the Financial proceeding only insofar as they may have alerted any person to the existence of an alleged fraud ring involving certain defendants, particularly the publicly named attorneys. The circumstantial evidence indicates the public disclosure of the alleged fraud ring may have prompted Allstate to investigate whether fraud was perpetrated on it. But Mr. Wong's uncontradicted declaration demonstrates it was only through Allstate's own considerable efforts that the facts specific to frauds perpetrated on it came to light. Mr. Wong, the investigator who engaged in a lengthy analysis of claims presented to Allstate, made no reference to the Financial action in his disclosures. Mr. Wong explained he did not receive any facts pertinent to the fraudulent claims at issue in this case from the Manning firm. Allstate's own investigative efforts resulted in 78 confessions by participants in frauds directed at its insureds. Allstate identified, through review of its claims files and interviews with claimants, the identities of multiple individuals not identified in the Financial pleadings or the publicity surrounding its lawsuit. Allstate alone uncovered evidence of 99 allegedly staged collisions and 326 separate allegedly fraudulent insurance claims, *none* of which are involved in the Financial suit. There is no evidence any Financial employee discovered any facts pertaining to any specific claim which is the subject of the present lawsuit. It is undisputed Allstate voluntarily provided detailed information about the frauds perpetrated on it to the district attorney and insurance commissioner. The district attorney and the insurance commissioner chose not to intervene in this proceeding. To hold that Allstate's action is barred would be contrary to the legislative goal of encouraging insurers to participate in the battle against automobile insurance fraud by bringing section 1871.7 actions; undermine the legislative intent that insurers assist in the prevention, identification, investigation, and prosecution of automobile insurance fraud; and would diminish realization of the legislative goal of coordinated efforts by law enforcement agencies and insurers to deal with the serious and prevalent insurance fraud problem.

Furthermore, Allstate is not a parasite or an opportunist. Allstate did not simply take information publicly disclosed in connection with Financial's lawsuit and, without contributing anything to the exposure of fraud, bring its own section 1871.7 action. Allstate did not seek "quick cash" without assisting in exposing automobile insurance fraud. Allstate, through its own investigation and expenditure of its own resources, uncovered at least 99 allegedly staged collisions, 326 allegedly fraudulent insurance claims, and the identities of numerous individuals who allegedly participated in the fraud. State and local government has everything to gain, and little if anything to lose, by this action. To sum up, as to the allegedly fraudulent insurance claims, Allstate, through the efforts of Mr. Wong, is the original source within the meaning of subdivision (h)(2).

A final note is in order. The California Legislature has adopted language substantially similar to the federal public disclosure bar in enacting the California False Claims Act. (Gov. Code, § 12652, subd. (d)(3)(A)-(B).[4]) (*American Contract Services v. Allied Mold & Die, Inc.* (2001) 94 Cal.App.4th 854, 858 [114 Cal.Rptr.2d 773]; *Rothschild v. Tyco Internat. (US), Inc., supra,* 83 Cal.App.4th at p. 494.) Like the federal False Claims Act, California's False Claims Act has as its purpose the following: "In 1987, the California Legislature enacted the False Claims Act, patterned on a similar federal statutory scheme (31 U.S.C. § 3729 et seq.), to supplement governmental efforts to identify and prosecute fraudulent claims made against state and local governmental entities. (See Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1441 (1987-1988 Reg. Sess.) as amended Sept. 8, 1987, p. 5.)" (*Rothschild v. Tyco Internat. (US), Inc., supra,* 83 Cal.App.4th at p. 494; see *City of Pomona v. Superior Court* (2001) 89 Cal.App.4th 793, 800-805 [107 Cal.Rptr.2d 710].) Like the federal False Claims Act, the California statute was intended to limit the availability of qui tam actions so as to protect against "opportunistic" or "parasitic" actions. (See *Rothschild v. Tyco Internat. (US), Inc., supra,* 83 Cal.App.4th at p. 499.) There is no California decisional authority interpreting the public disclosure bar of the California False Claims Act. We do not address the public disclosure bar in the California False Claims Act.

[4]Government Code section 12652, subdivision (d)(3)(A) through (B) states: "(3)(A) No court shall have jurisdiction over an action under this article based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in an investigation, report, hearing, or audit conducted by or at the request of the Senate, Assembly, auditor, or governing body of a political subdivision, or by the news media, unless the action is brought by the Attorney General or the prosecuting authority of a political subdivision, or the person bringing the action is an original source of the information. [¶] (B) For purposes of subparagraph (A), 'original source' means an individual who has direct and independent knowledge of the information on which the allegations are based, who voluntarily provided the information to the state or political subdivision before filing an action based on that information, and whose information provided the basis or catalyst for the investigation, hearing, audit, or report that led to the public disclosure as described in subparagraph (A)."

## IV. Disposition

The dismissal order is reversed. Allstate Insurance Company is to recover its costs on appeal, jointly and severally, from Douglas Weitzman, Law Offices of Douglas W. Weitzman, Gary A. Laff, Law Offices of Gary A. Laff, David M. Berger, Law Offices of David M. Berger, Gary Karpel, Diane Fooks, Elizabeth Artega, Barbara A. Reid, Law Offices of Barbara A. Reid, Isaak Zelyony, Merlin Smith, Anatoly Bondarev, and ABS Health Care and Rehabilitation Center.

Grignon, J., and Mosk, J., concurred.

Petitions for a rehearing were denied April 24, 2003, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied June 11, 2003. Chin, J., did not participate therein.