Filed 12/21/22; Modified and Certified for Pub. 1/20/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| STATE OF CALIFORNIA ex rel. MARY LYNN RAPIER et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>ENCINO HOSPITAL MEDICAL CENTER et al.,<br><br>    Defendants and Respondents. | B302426, B303196<br><br>(Los Angeles County Super. Ct. No. BC641254) |

    APPEALS from a judgment and post-judgment order of the Superior Court of Los Angeles County, William F. Fahey, Judge. Affirmed.

    California Department of Insurance, J. Scott McNamara, Assistant Chief Counsel, Nicholas G. Campins and Sara Kim Danielson, Trial Attorneys, for Plaintiff and Appellant State of California.

    Waters Kraus & Paul, Gary M. Paul, Michael L. Armitage, Charles S. Siegel, Kay Gunderson Reeves; Bartlett Barrow, Brian

P. Barrow and Jennifer L. Bartlett for Plaintiff and Appellant Mary Lynn Rapier.

Knox Ricksen, Thomas E. Fraysse and Taylor T. Steele for Anti-Fraud Alliance as Amicus Curiae on behalf of Plaintiffs and Appellants.

Katten Muchin Rosenman, Ryan M. Fawaz and Christopher B. Maciel for The Coalition Against Insurance Fraud as Amicus Curiae on behalf of Plaintiffs and Appellants.

Jacklyn DeMar; Goldberg Kohn, Roger A. Lewis, W. Kyle Walther; Rukin Hyland & Riggin and Valerie Brender for Taxpayers Against Fraud Education Fund as Amicus Curiae on behalf of Plaintiffs and Appellants.

King & Spalding, Peter A. Strotz, Paul R. Johnson, James W. Boswell and Michael E. Paulhus for Defendants and Respondents.

————————————

This proceeding arises out of a *qui tam* action against Prime Healthcare Services—Encino Hospital, LLC (Encino Hospital) and others to impose civil penalties for violation of the Insurance Fraud Prevention Act (IFPA), Insurance Code section 1871 et seq.  The State of California and relator Mary Lynn Rapier appeal from a judgment entered after a bench trial in which the court found insufficient evidence supported their allegations that defendants engaged in insurance fraud by billing insurers for services performed in a detox center for which they had no appropriate license, and by employing a referral agency to steer patients to the center.  We affirm the judgment.

# BACKGROUND

Encino Hospital was licensed by the Department of Public Health (sometimes CDPH) as a general acute care hospital (sometimes GACH).

SRCC Associates, LLC was formed to operate a long-term detox facility.

Through a management services agreement, Encino Hospital engaged SRCC Associates to manage and operate Serenity Recovery Center (Serenity) at the hospital, under the hospital's direction and control, to provide acute (i.e., short-term) drug and alcohol detoxification services. Serenity operated at Encino Hospital from November 3, 2015, to January 31, 2019. The program provided no long-term or outpatient services.

## A. Complaint

On November 18, 2016, Mary Lynn Rapier filed this *qui tam* action[1] on behalf of the People of the State of California, alleging employment-related claims and various violations of the Insurance Code against 10 defendants. Rapier filed the complaint in the name of the State of California, under seal, as required by statute (Ins. Code, § 1871.7, subd. (e)), but the superior court unsealed it on February 5, 2018, when the California Department of Insurance (CDI) elected to intervene.

---

[1] " '*Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means "who pursues this action on our Lord the King's behalf as well as his own." ' " (*San Francisco Unified School Dist. ex rel. Contreras v. Laidlaw Transit, Inc.* (2010) 182 Cal.App.4th 438, 442, fn. 2; *Vermont Agency of Natural Resources v. U.S. ex rel. Stevens* (2000) 529 U.S. 765, 768, fn. 1.)

(We will refer to the CDI and the State of California interchangeably.) From that point forward, CDI had "the primary responsibility for prosecuting the action." (Ins. Code, § 1871.7, subd. (f)(l).)[2]

On May 2, 2018, the CDI filed a first amended complaint alleging employment and insurance fraud claims against 17 defendants. The trial court ordered arbitration as to the employment claims but stayed arbitration pending the outcome at trial of the insurance fraud claims.

On November 9, 2018, CDI filed the operative second amended complaint, which was eventually pared down to allege a cause of action for "illegal patient steering," in violation of subdivision (a) of section 1871.7, and a cause of action for "submission of false claims" in violation of subdivision (b) of that section. CDI alleged the causes of action against six defendants: Encino Hospital, Prime Healthcare Services, Inc., and Prime Healthcare Foundation, Inc. (collectively Prime); and SRCC Associates, its principal, Jonathan Lasko, and JNL Management, LLC (collectively SRCC).

Of note in this paring down process, the trial court ruled that no triable issue of material fact existed as to whether Encino Hospital was properly licensed by the California Department of Public Health as a general acute care hospital.

The CDI alleged that although Encino Hospital was properly licensed as a general acute care hospital, it could not legally operate a medical detoxification facility because it had no separate license as a chemical dependency recovery hospital (sometimes CDRH). The CDI alleged that in billing for detox

---

[2] Undesignated Statutory references will be to the Insurance Code.

services for which they had no proper license, defendants knowingly submitted at least 1,858 fraudulent insurance claims, requiring an award of damages of at least $57,678,436 before trebling.

CDI further alleged that Serenity employed a referring party to funnel patients to its program in exchange for Serenity discharging acute-care patients to chronic-care facilities affiliated with the referring party.

The parties engaged in some law and motion proceedings which we will describe in the discussion portion of this opinion as they become pertinent.

## B.     Trial

A bench trial commenced on June 19, 2019, at which CDI presented the testimony of multiple witnesses and introduced about 50 exhibits.

Jonathan Lasko, SRCC Associates' principal, testified that in 2014 he became involved in the medical detoxification business in Florida.  He came to California in 2015, formed SRCC Associates, and entered into a management services agreement with Encino Hospital.  Lasko testified the management services agreement was a lengthy and detailed contract that "went back and forth" between the lawyers.  Lasko deferred to his lawyers regarding all licensing issues.

Lasko testified that SRCC Associates set up Serenity's detox program on the third floor of Encino Hospital, and began operations in November 2015.  The hospital made 28 beds available for the program.  In 2016, Lasko hired Rapier as the director of Serenity's clinical services.

Serenity obtained patients through an in-house marketing program and through referrals from such entities as Aid in

5

Recovery, LLC (AIR), a call center. There was no written agreement between Serenity and AIR, and Serenity did not pay for referrals.

Serenity's patients, who were admitted only with a doctor's approval, were provided 24-hour inpatient care, usually staying for three to seven days. Serenity was not a lock-down facility; its patients could leave at any time. Most patients preplanned their transfer to a long-term residential treatment facility after their stay at Serenity. Lasko testified that a predetermined discharge plan was sometimes necessary because patients undergoing acute detoxification were unable to make sensible long-term decisions.

The patients' medical expenses were covered by insurance companies or other providers, whom Encino Hospital billed.

Lasko testified that based on the advice of his attorneys, Serenity did not need its own license to operate a detox program at Encino Hospital. He never heard anything different from CDI or the Department of Public Health. Serenity closed its program in early 2019. He also testified that it was "very" common in the industry for detox patients to arrive with a predetermined discharge location.

Roland Santos, the Chief Nursing Officer for Sherman Oaks Hospital, testified as a hospital licensing expert. He stated that Encino Hospital is licensed by the Department of Public Health as a general acute care hospital, and Serenity could operate under the hospital's license. Santos testified this was confirmed by Eric Stone, a program manager for the Department of Public Health, who informed Santos that medical detoxification was an inpatient service that could be provided in a hospital's general acute care beds.

Dr. Robert Waldman, a physician specializing in addiction medicine, agreed with Lasko's testimony that the proper treatment plan for addicts was to start with a short-term detox program followed by transfer to a long-term residential program, usually for 30 to 60 days, followed by even longer outpatient treatment. However, Waldman opined that a patient should not start a detox program with a preplanned discharge scenario, nor obtain a discharge plan from any referral service, but should choose a long-term residential plan with the help of the acute care center's "interdisciplinary team." However, Waldman admitted that there was no agreed upon standard as to when a long-term referral plan should be made, that "there would be differing opinions among doctors" as to when discharge planning should begin, and that patients in detox "may not be willing to be steered" as to a proper discharge plan.

Em Garcia, the Chief Nursing Officer and Administrator for Encino Hospital, testified that the hospital had provided detox services before its relationship with Serenity, and did so after Serenity left. He did not believe that Serenity needed its own separate license, and in fact Encino Hospital had management agreements with other unlicensed groups which provided licensed professional services in the hospital, including for emergency treatment, rehabilitation services, anesthesiology, and occupational therapy.

Garcia testified that in late 2016, after the Serenity program had been operating for about nine or ten months, a surveyor from the Joint Commission, a private national accreditation agency which sets standards for the industry, questioned the adequacy of SRCC's and Encino Hospital's

7

licensing.  In response, Garcia represented to the surveyor that no additional licensing was required.

In 2017, Encino Hospital was involved in a survey by the Department of Public Health, which raised no complaints about Serenity's licensing status.

Garcia testified he worked with Rapier on policies and procedures after she was hired by Serenity, and neither she nor any other Serenity employee expressed a concern about Serenity's license status, patient referrals, or the patient discharge process.

Garcia never received any complaint from CDI or the Department of Public Health about Serenity's license status, and in fact the department continued to renew Encino Hospital's license even after the allegations in this lawsuit were made public.  Garcia had no knowledge of AIR until this case was filed.

Eric Stone, a licensing expert, testified that he retired from the Department of Public Health in 2017.  His job had been to enforce both state and federal laws and regulations, including those involving licensing, and over the years he had many conversations with the Encino Hospital management team, including Santos.  Stone claimed not to remember the conversation with Santos in which, Santos testified *ante*, he stated that medical detoxification was an inpatient service that could be provided in a hospital's general acute care beds.  The trial court found Stone's demeanor was evasive, and his claim of no memory unlikely.  The court speculated Stone was taking a different position than he had while still employed by Department of Public Health because the CDI had changed its position.

8

Rapier testified that she applied for a job with Serenity and was granted what she described as a three-month interview process, during which she worked at Serenity to learn about its operation. She was eventually offered the job, and started part time in March 2016 and full time on April 1, but took a medical leave of absence at the end of June and was terminated by Lasko in August 2016. Rapier admitted that prior and subsequent to her brief employment at Serenity she had no experience in an acute detox facility in a hospital setting.

Rapier did not claim to have reported licensing or steering issues to anyone before she was terminated, and failed to produce a memorandum of "policies and procedures" that she claimed to have written but Serenity ignored.

The court found that Rapier's testimony on key issues was not very credible, and "overall, Rapier did nothing to advance CDI's case."

Evelyn Kim, a consultant on medical practices who also investigates fraud claims, testified she was first approached by Rapier for purposes of this litigation, and was hired by Rapier's attorneys to opine on a standard form used to bill insurance companies. Kim opined that if Encino Hospital used the form, SRCC would have to be listed as a healthcare provider, and its National Provider Identifier number furnished. However, the court found Kim's testimony was rambling and difficult to understand, conveying the "distinct impression" that she was unfamiliar with the standard form, and "was making up her answers." Kim gave no testimony as to what disclosures from a detox service insurance companies considered to be material.

Kim admitted she had never worked in a hospital nor been involved in hospital billings, had no experience with or

9

background in California insurance regulations, reviewed none of the claim forms submitted to insurers by Encino Hospital, and had no opinion as to whether the hospital's claim forms were accurate or whether Encino Hospital or SRCC intended to defraud any insurance provider. Kim admitted that she wrongly assumed Serenity was a long-term residential drug and alcohol treatment program.

The court found that no evidence supported Kim's opinion that SRCC had to be specified as a healthcare provider on a claim form, and in any event the Serenity detox program *was* identified on Encino Hospital's claim forms. Ultimately, the court found, Kim's testimony was of no value in showing that Encino Hospital made material false statements or omissions on claim forms submitted to California insurance companies.

Jennifer Vachet, a licensed marriage and family therapist who previously worked for Rapier but had no prior experience in a hospital setting or with a detox facility, testified that Rapier hired her to work for Serenity in 2016 as a social services manager. She worked there for seven months, resigning after another employee lodged a complaint against her. Vachet admitted that Serenity personnel made no medically improper discharge decisions.

Denise Durity, who handled Serenity's billings, recalled that Encino Hospital used its National Provider Identifier number to bill for Serenity's services, but she was not shown any claim submitted by Encino Hospital to any insurance company.

CDI presented excerpts from the deposition of Dr. Joshua Diamond, Serenity's medical director, who opined that it was a "best practice" to begin discharge planning only at the time of admission, not before. Dr. Diamond based this opinion on some

10

unidentified "information that [he] researched to prepare [a] document from insurance companies who would recommend this as well." CDI introduced neither the document nor any other evidence to corroborate Dr. Diamond's opinion.

Dr. Diamond testified that Serenity had daily interdisciplinary treatment group meetings at which discharge decisions would be discussed, but did not specify how often he attended these meetings. He admitted he had no responsibility for discharge decisions.

Dr. Diamond testified that he accused Robert Canova, Serenity's director of operations, of "fraud" in a text message, because Canova caused Serenity to hold patients longer than necessary for financial reasons. The message was not introduced into evidence, and neither Diamond nor CDI identified any patient as to which this occurred or connected any patient in this category to a claim made to a California insurance company.

Dr. Diamond admitted he had no knowledge of patients' preplanned discharge plans, and no evidence of any financial arrangements between Serenity and the long-term care facilities to which patients would be discharged. The court found Dr. Diamond provided no support for CDI's steering theory.

Finally, CDI introduced excerpts of Canova's deposition, who admitted he was unaware of any insurer questioning Serenity's licensure, and testified that Em Garcia told him on several occasions that the correct licensing was in place. Canova testified that AIR was for a time Serenity's largest referral source, and AIR-referred patients arrived at Serenity with a preplanned discharge strategy. Canova admitted that not all AIR-referred patients were discharged to an AIR-affiliated

11

facility, and he was unaware of any payment made by Serenity for patient referrals.

Canova testified that on occasion, when Dr. Diamond believed that a patient was medically cleared but the team believed a safe discharge location was not then available, Dr. Diamond "didn't want to wait for the available bed for a safe discharge location[,] so the patient [was] discharged to the street." Canova testified that patients usually had a predetermined facility as part of their "continuity of care plan."

Defendants rested without calling any witnesses.

## C. Posttrial Proceedings

In its closing brief, CDI argued there were 4,135 false claims, for which "assessments" should be imposed in the amount of $139 million plus a penalty range of $20 to $41 million against all six defendants.

In their closing brief, the Prime defendants argued that CDI "vastly overreached in pursuing a case beyond its limited jurisdiction."

The court found that CDI's conclusory allegations of aiding and abetting and conspiracy were unsupported by any evidence suggesting liability on the part of Prime Healthcare Foundation, Prime Healthcare Services, or JNL Management. The court chided CDI for failing to dismiss these defendants either when it knew it would introduce no evidence of their liability or at the conclusion of the evidence.

The court found that CDI's claims, which alleged conduct that no licensing or accrediting agency had found to be troubling, including the CDI itself, constituted a vast overreach as to parties, theories, and scope. The court also found that CDI failed to fulfill its ethical obligation to be scrupulously fair, in that it

12

pursued the litigation against several defendants beyond any reasonably colorable claim. The court found it troubling that CDI appeared to have abdicated its statutory responsibility to take the primary role in prosecuting the action, instead ceding control to Rapier's attorneys.

On the merits, the court found that CDI's fraud theory was unsupported by any evidence of a false statement or omission, specific intent to defraud, materiality, or reliance. On the contrary, the undisputed evidence was that all defendants intended to follow the law, consulted attorneys when unsure about what to do, and relied on a lack of information from any agency, including CDI, that their practices were improper, even after the allegations in this case were made public. The court therefore concluded that CDI failed to show that defendants intended to defraud anyone or that any alleged false statement or omission was material, an issue on which CDI called no witness except Kim, whom the court found to be unpersuasive.

As to CDI's steering theory, the court found CDI failed even to provide a clear definition of steering, and offered no evidence that any defendant employed anyone to steer patients to Serenity, as there was no evidence of payments or remuneration of any kind. Even if a monetary exchange was not required for steering to occur, the court found that no evidence suggested defendants exchanged any benefit with AIR for referrals. On the contrary, the undisputed evidence showed it was common and ethical for a detox facility to help a patient find a longer term residential facility, and there was no agreed-upon standard to follow in doing so.

13

The court concluded that defendants were entitled to judgment in their favor, and later denied CDI's and the relator's motions for new trial.[3]

CDI appealed from the final judgment and separately appealed from the order denying its motion for a new trial. We consolidated the appeals for purposes of briefing, oral argument, and decision.[4]

## DISCUSSION

CDI and the relator contend the trial court erred by interpreting the IFPA as applying only to fraudulent claims as opposed to simply false claims, and by interpreting subdivision (a) of section 1871.1 as requiring a cash exchange as opposed to an exchange of any item or service of value. CDI further contends the trial court erred in denying it a jury trial, denying a continuance, and awarding an item of costs.

## A.    Preliminary Considerations

The Prime defendants preliminarily argue that Rapier may assert no argument on appeal beyond the arguments raised by CDI because CDI has a statutory obligation to lead this litigation.

---

[3] A relator is a real party in interest in whose name a state or attorney general brings a lawsuit. He or she is generally the person who furnishes information on which the lawsuit is based. (*People ex rel. Allstate Ins. Co. v. Weitzman* (2003) 107 Cal.App.4th 534, 538.)

[4] On December 17, 2021, CDI's appeal as to the SRCC defendants was dismissed without prejudice. The order denying CDI's new trial motion is not itself appealable, but is reviewable on appeal from the underlying judgment. (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 18-19; Code Civ. Proc., § 904.1, subd. (a)(2).)

14

(§ 1871.7, subd. (f)(1).)  We disagree.  Although the CDI maintains the primary responsibility for prosecuting this action, Rapier enjoys the "right to continue as a party to the action." (§ 1871.7, subd. (f).)  When independent parties join forces in litigation, it is not uncommon for each to take a slice of the available arguments on appeal.  To hold otherwise would invite even more duplication than is already inherent in multi-party litigation.

After filing their opening briefs, CDI and Rapier settled their case against the SRCC defendants and stipulated to dismiss their appeal as to those defendants without prejudice.  The Prime defendants argue that pursuant to the doctrine of collateral estoppel, the settlement and dismissal are "dispositive of all claims raised on appeal" against them, including that plaintiffs were entitled to a jury trial, that they were entitled to a new trial based on denial of a continuance, and that common finings on multiple elements of plaintiffs' causes of action were incorrect. We disagree.

"Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings."  (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341.)  But " 'an appeal "is not a separate proceeding and has no independent existence" [citation]; it is merely the continuation of an action.' "  (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 969.)  No authority of which we have been made aware applies the doctrine of collateral estoppel to different parties in the same proceeding.  If finality as to one party in a proceeding forestalled the appellate rights of another party, all appeals would have to be all-or-nothing affairs where all losing parties appeals or none do.  That has never been the law.

15

**B.    Standard of Review**

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo, and we review the trial court's findings of fact for substantial evidence." (*Durante v. County of Santa Clara* (2018) 29 Cal.App.5th 839, 842.) " 'Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings.' " (*RSCR Inland, Inc. v. State Dept. of Public Health* (2019) 42 Cal.App.5th 122, 131.)

**C.    Violation of the IFPA**

**1.    History and purpose of the IFPA**

The IFPA, originally enacted in 1993, consists of eight articles concerning insurance fraud.[5] Article 1 (titled False and Fraudulent Claims) comprises sections 1871 through 1871.9.[6] Section 1871 sets forth legislative findings and states the Legislature's intention is to "permit the full utilization of the expertise of the commissioner and the department so that they may more effectively investigate and discover insurance frauds, halt fraudulent activities, and assist and receive assistance from federal, state, local, and administrative law enforcement agencies

---

[5] Statutes 1993, chapter 120, section 3.3 (Assem. Bill No. 1300), effective July 16, 1993.

[6] The IFPA is Chapter 12 of Part 2 (The Business of Insurance) of Division 1 (General Rules Governing Insurance) of the Insurance Code, sections 1871-1879.8. Articles 2 through 8 of the IFPA govern various aspects of the administration of insurance claims and the investigation, reporting, and prevention of insurance fraud.

16

in the prosecution of persons who are parties in insurance frauds." (§ 1871, subd. (a).)

Subdivision (h) of section 1871 explains that "[h]ealth insurance fraud is a particular problem for health insurance policyholders. Although there are no precise figures, it is believed that fraudulent activities account for billions of dollars annually in added health care costs nationally. Health care fraud causes losses in premium dollars and increases health care costs unnecessarily."[7]

When section 1871.7 was originally enacted it prescribed civil penalties for the employment of runners, cappers, steerers or other persons to procure clients or patients or obtain workers' compensation benefits, without regard to the nature of any insurance claim submitted for payment. (Former § 1871.7, subd. (a), Stats. 1993, ch. 120 (Assem. Bill No. 1300 (July 16, 1993).) Section 1871.7 was amended in 1994, adding conduct done with an intention to engage in activities prohibited by Penal Code sections 549, 550, and 551 (which criminalize the making of false or fraudulent claims to insurers), and to provide civil penalties for that conduct. (Former § 1871.7, amended Stats. 1994, ch. 1247, § 1 (Assem. Bill No. 1926).)

Section 1871.7 was amended in several respects in 1995. Notably, the amendment made it unlawful to use runners, cappers, steerers or others not just to obtain workers'

---

[7] Subdivisions (b) through (g) of section 1871 deal with issues of fraud in automobile and workers' compensation insurance. Section 1871.7 originally dealt only with workers' compensation claims, until its scope was expanded by amendment in 1994 to apply also to " 'crimes involving fraudulent claims against insurers.' " (*People ex rel. Allstate Ins. Co. v. Weitzman supra*, 107 Cal.App.4th at p. 548.)

compensation benefits, but also to procure claims to insurers. (Former § 1871.7, amended Stats. 1995, ch. 574, § 2 (Sen. Bill No. 465).) Although the former law allowed actions arising from any workers' compensation claim even if the claim was not fraudulent, according to the Senate Committee on Criminal Procedure, section 1871.7 as amended required proof that a claim was illegal and fraudulent. (Analysis of the Sen. Comm. on Crim. Proc., Sen. Bill No. 465 (1995-1996 Reg. Sess.), p. 5.) The committee went on to explain that the amended bill "would make it unlawful and provide for disgorgement of profits whenever a capper is used," because, according to the bill's sponsor (with respect to automobile insurance claims), "fraud is almost always present when cappers are used." (*Ibid.*)

Section 1871.7 was amended again in 1999, by adding the last sentence to subdivision (b), which provided for the first time that penalties are to be assessed for each fraudulent claim presented to an insurer, instead of for each violation of subdivision (a). (Former § 1871.7, amended Stats. 1999, ch. 885, § 2 (Assem. Bill No. 1050); see Amendments, Deering's Ann. Ins. Code (2009 ed.) foll. § 1871.7, p. 274.)

### 2. Statutory interpretation

Our fundamental task in construing a statute is to ascertain the intent of the Legislature and effectuate the statute's purpose. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.) "[S]uch a construction is, if possible, to be adopted as will give effect to all" of the statutory language. (Code Civ. Proc., § 1858.) When the language of the statute is clear and unambiguous, the "plain meaning" rule applies; we presume the Legislature meant what it said. (*Day*, at p. 272.)

**D.    Application**

**1.    False claims**

Subdivision (b) of section 1871.7 provides in pertinent part: "Every person who violates any provision of this section or Section 549, 550, or 551 of the Penal Code shall be subject . . . to a civil penalty of not less than five thousand dollars ($5,000) nor more than ten thousand dollars ($10,000), plus an assessment of not more than three times the amount of each claim for compensation . . . .  The penalty prescribed in this paragraph shall be assessed for each fraudulent claim presented to an insurance company by a defendant . . . ."  Penal Code section 550 applies to "any false or fraudulent claim for the payment of a loss or injury, . . . under a contract of insurance" and "any false or fraudulent claim for payment of a health care benefit."  (Pen. Code, § 550, subd. (a)(1), (6).)

Here, CDI alleged that Encino Hospital misrepresented to insurers that it was properly licensed to provide detox services when it was not.  The trial court found no evidence suggesting that defendants presented a false claim to any insurer.  We agree; no authority of which we are aware or to which we have been directed obligates Encino Hospital to hold any license other than its license as a general acute care hospital.

"No person . . . shall operate . . . health facility in this state, without first obtaining a license" from the Department of Public Health.  (Health & Saf. Code, § 1253, subd. (a).)  It is undisputed that Encino Hospital is licensed as a general acute care hospital by the Department of Public Health.

Relying on and selectively quoting from Health and Safety Code sections 1250.3, subdivision (a) and 1254.2, subdivision (a), Rapier argues that "any facility providing '24-hour inpatient care

19

for persons who have a dependency on alcohol or other drugs, or both alcohol and other drugs' must be licensed as a 'chemical dependency recovery hospital.' " Neither of these statutes so provides, either separately or in combination.

Health and Safety Code section 1250.3, subdivision (a), provides: "As defined in Section 1250, 'health facility' includes the following type: 'Chemical dependency recovery hospital' means a health facility that provides 24-hour inpatient care for persons who have a dependency on alcohol or other drugs, or both alcohol and other drugs. This care shall include, but not be limited to, the following basic services: patient counseling, group therapy, physical conditioning, family therapy, outpatient services, and dietetic services. Each facility shall have a medical director who is a physician and surgeon licensed to practice in this state." Health and Safety Code section 1254.2 simply provides that the Department of Public Health "shall license chemical dependency recovery hospitals to provide the basic services specified in subdivision (a) of Section 1250.3."

Neither statute provides that a general acute care hospital such as Encino Hospital becomes a chemical dependency recovery hospital simply because it offers the same services a chemical dependency recovery hospital would offer.

On the contrary, a general acute care hospital may provide chemical dependency recovery services "as a supplemental service." (Health & Saf. Code, § 1250.3, subd. (d)(1).) When it does so, "the general acute care hospital . . . shall provide the supplemental services in a distinct part of the hospital or freestanding facility, if the distinct part satisfies the criteria

20

established by law and regulation for approval as a chemical dependency recovery supplemental service." (*Ibid.*)[8]

Nothing about this scheme obligates a general acute care hospital to obtain some different license.

Rapier acknowledges that a general acute care hospital may provide acute detox services without an entirely new license but, she argues, selectively quoting from subdivision (d) of Health and Safety Code section 1250.3, such a hospital may do so only "so long as they obtain CDPH's 'approval' to provide such services."

The statue does not say that. Health and Safety Code section 1250.3, subdivision (d) provides that a general acute care hospital may provide acute detox services "in a distinct part of the hospital or freestanding facility, *if the distinct part satisfies the criteria established by law and regulation for approval* as a chemical dependency recovery supplemental service." (Italics added.) The statute says only that the distinct part of the hospital must *satisfy the criteria* for approval as a chemical

---

[8] Subdivision (d) of Health and Safety Code section 1250.3 provides in pertinent part: "Chemical dependency recovery services may be provided as a supplemental service in existing general acute care beds and acute psychiatric beds in a general acute care hospital or in existing acute psychiatric beds in an acute psychiatric hospital or in existing beds in a freestanding facility, as defined in subdivision (c). When providing chemical dependency recovery services as a supplemental service, the general acute care hospital, acute psychiatric hospital, or freestanding facility, as defined in subdivision (c), shall provide the supplemental services in a distinct part of the hospital or freestanding facility, if the distinct part satisfies the criteria established by law and regulation for approval as a chemical dependency recovery supplemental service."

dependency recovery supplemental service, not that the hospital must actually obtain a separate CDPH approval.

Department of Public Health regulations generally require approval for provision of supplemental services: "Any licensee desiring to establish or conduct . . a supplemental service, shall obtain prior approval from the Department . . . ." (Cal. Code Regs., tit. 22, § 70301, subd. (a).) The regulations then list 28 supplemental services for which approval is required. (*Id.* at §§ 70401-70657 [e.g., acute respiratory care, burn center, dental service, intensive care newborn, pediatric service, perinatal service, radiation therapy, social service, speech pathology, standby emergency medical service, etc.].) "Chemical dependency recovery services" are not among the long list of supplemental services for which a general acute care hospital requires Department of Public Health approval.

Rapier also argues that Encino Hospital was obligated but failed to identify Serenity as a provider on its insurance claims, a theory beyond CDI's statement at trial about contested issues. In any event, the trial court rejected the theory because no evidence supported it. The only exhibit containing actual claim forms, Exhibit 1111, showed that Serenity *was* disclosed to insurers. CDI instead relied at trial on Exhibit 1061, listing 4,484 claims, but the court found that this exhibit was prepared for litigation, and did not correlate to actual claim forms.

Because Encino Hospital needed no separate license or approval, and no evidence showed it concealed any provider, the CDI's cause of action for false claims fails for lack of a predicate. We therefore need not decide whether the IFPA requires a showing of scienter or materiality.

22

### 2. Steering

CDI's steering theory was that AIR sometimes referred an addiction recovery patient to Serenity in exchange for Serenity's promise not to interfere with the patient's preadmission plan to be discharged to an AIR-affiliated treatment center for follow-on care. In other words, CDI alleged, Serenity permitted patients to be referred to follow-on care facilities based on profit, not the patients' best interests. CDI argues the trial court misconstrued the law applicable to this claim, and in doing so erred by finding the evidence weighed against it. We disagree.

Subdivision (a) of section 1871.7 provides: "It is unlawful to knowingly employ . . . steerers . . . to procure . . . patients to . . . obtain services or benefits . . . that will be the basis for a claim against an . . . insurer."

"A steerer has been held to be one who gains the confidence of the person intended to be fleeced [citation] and who may be said to steer or lead the victim to the place where the latter is to be robbed or swindled." (*Barron v. Board of Dental Examiners of Cal.* (1930) 109 Cal.App. 382, 385.)

Here, the trial court found that any evidence suggesting that Serenity employed AIR to procure patients was outweighed by evidence that no such employment existed.

To begin, no evidence indicated that Serenity or Encino Hospital either received compensation for referring patients to residential treatment centers or paid for referrals to the Serenity program.

Under the most liberal construction of CDI's theory, under which a cash exchange is not required, Serenity "employed" AIR by expressly or tacitly agreeing, in exchange for referrals, to honor a patient's preplanned treatment regimen, which

23

benefitted AIR because the plan included later referral to an AIR-affiliated facility.

But no evidence indicated that such an agreement existed. CDI attempted to establish an *inference* for such an agreement by establishing that it was "universally accepted" that an acute detox facility should refuse to honor a patient's preplanned treatment regimen. Serenity would fail to follow this universal standard, CDI theorized, only if motivated to do so by a prior agreement with AIR to obtain referrals.

Little to no evidence supported the theory. Dr. Waldman, CDI's expert on the standards for referring acute detox patients to long-term facilities, stated only that preselecting a long-term facility in advance of detox would violate the best practices standard, not any universally accepted standard. He testified he was unaware of any professional standard specifying when discharge locations should be established for substance use disorder patients, and agreed that reasonable medical professionals could disagree about the timing of discharge planning. Lasko testified that it was "very" common for a patient to arrive at a detox facility with a predetermined discharge location for long-term care.

The evidence thus afforded no reasonable basis upon which to infer that Serenity declined to interfere with patients' preplanned discharge locations to secure its own profits.

Rapier argues it is irrelevant whether it was common and ethical to exchange a patient referral for a promise to discharge the patient to a facility owned by the referral source's affiliate, because "[i]f conduct is made illegal by statute, 'everybody's doing it' is not a defense."

24

This misses the point. The question is whether Serenity "employed" AIR to obtain referrals. There being no express agreement to that effect, nor remuneration exchanged, CDI infers the employment from the fact that Serenity's discharge orders benefitted AIR. However, that it was common and ethical to discharge a patient to a facility affiliated with the referring party negates Rapier's claim that the discharge orders were evidence of AIR's employment.

With the employment inference negated, little to no evidence supported CDI's steering theory, and substantial evidence weighed against it. The trial court was therefore justified in finding that CDI failed to prove its theory.

E.    **Procedural Issues**

1.    **Jury trial**

CDI demanded a jury trial but failed to deposit jury fees. The trial court therefore granted Prime's motion to strike the demand for a jury trial, finding that jury fees were not timely paid, and in any event CDI's causes of action were not subject to jury trial. CDI moved for relief under Code of Civil Procedure section 631, which the trial court denied. CDI then petitioned for a writ of mandate, which we denied. (*State of California v. Superior Court* (B298315, June 19, 2019) pet. denied.)

CDI argues the trial court erred in denying CDI's right to a jury trial. We disagree.

A trial court's decision whether to allow jury trial where there has been a waiver is reviewed for abuse of discretion. (Code Civ. Proc., § 631, subds. (f) & (g).)

Here, Rapier failed to pay the initial jury fee until it was four months late, and CDI never paid it. (See Code Civ. Proc.,

25

§ 631, subd. (f)(5).)  The trial court therefore acted within its discretion in striking CDI's request for a jury trial and denying its application for relief under Code of Civil Procedure section 631.

On the merits, CDI was not entitled to a jury trial on its claims.

" '[T]he right to a jury trial in a civil action may be afforded either by statute or by the California Constitution.' " (*Nationwide Biweekly Administration, Inc. v. Superior Court of Alameda County* (2020) 9 Cal.5th 279, 296-297 (*Nationwide*).)

The IFPA affords no explicit right to a jury trial on causes of action it creates.

Article I, section 16 of the California Constitution states in relevant part that "[t]rial by jury is an inviolate right and shall be secured to all . . . ."

"From the outset of our state's history, our courts have explained that this provision was intended *to preserve* the right to a civil jury as it existed at common law in 1850 when the jury trial provision was first incorporated into the California Constitution."  (*Nationwide*, *supra*, 9 Cal.5th at p. 315.) "Pursuant to this historical approach, as a general matter the California Constitution affords a right to a jury trial in common law actions at law that were triable by a jury in 1850, but not in suits in equity that were not triable by a jury in 1850."  (*Ibid.*) " ' "In determining whether the action was one triable by a jury at common law, the court is not bound by the form of the action but rather by the nature of the rights involved and the facts of the particular case—the gist of the action.  A jury trial must be granted where the gist of the action is legal, where the action is in reality cognizable at law." ' "  (*Ibid.*)

26

"At early common law, actions at law typically involved lawsuits to recover money damages for injuries caused by breach of contract or tortious conduct. Equitable causes of action typically sought relief such as injunctions, orders for specific performance, or the disgorgement of ill-gotten gains, which were unavailable in actions at law." (*LaFace v. Ralphs Grocery Co.* (2022) 75 Cal.App.5th 388, 395.)

"The constitutional right of trial by jury is not to be narrowly construed. It is not limited strictly to those cases in which it existed before the adoption of the Constitution but is extended to cases of like nature as may afterwards arise. It embraces cases of the same class thereafter arising. . . . The introduction of a new subject into a class renders it amenable to its general rules, not to its exceptions." (*People v. One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283, 300.)

Courts determine whether there is a right to a jury trial under the California Constitution by looking to the statutory scheme as a whole to determine whether the gist of a cause of action under the IFPA seeking both injunctive relief and civil penalties is legal or equitable. (*Nationwide*, *supra*, 9 Cal.5th at p. 324.) Whether a jury trial right exists under the state constitution is an issue of law subject to de novo review. (*Jogani v. Superior Court* (2008) 165 Cal.App.4th 901, 904.)

The foremost consideration is whether the IFPA's remedies are equitable in nature. (*DiPirro v. Bondo Corp.* (2007) 153 Cal.App.4th 150, 181 [" 'Determining whether the gist of a claim is in law or equity "depends in large measure upon the mode of relief to be afforded" ' "].)

The IFPA is a remedial statute intended to protect the public from sharp insurance practices. As noted, the

27

Legislature's intention in enacting it was to "permit the full utilization of the expertise of the commissioner and the department so that they may more effectively investigate and discover insurance frauds, halt fraudulent activities, and assist and receive assistance from federal, state, local, and administrative law enforcement agencies in the prosecution of persons who are parties in insurance frauds."  (§ 1871, subd. (a).)

The IFPA provides for civil penalties between $5,000 and $10,000, assessments of "not more than three times the amount of each claim for compensation," and "other" equitable relief, including temporary injunctive relief.  (§ 1871.7, subd. (b).)  The penalties "are intended to be remedial rather than punitive . . . . If the court finds, after considering the goals of disgorging unlawful profit, restitution, compensating the state for the costs of investigation and prosecution, and alleviating the social costs of increased insurance rates due to fraud, that such a penalty would be punitive . . . , the court shall reduce that penalty appropriately."  (§ 1871.7, subd. (c).)

"[A]n injunction to prohibit ongoing or future misconduct or an order requiring a defendant to provide specific performance or disgorge ill-gotten gains" is equitable in nature.  (*Nationwide*, *supra*, 9 Cal.5th at p. 293.)  That the IFPA's remedies include injunctive relief and "other" equitable relief supports finding that a cause of action under the IFPA to be equitable in nature.  (See *Lutz v. Glendale Union High School* (9th Cir. 2005) 403 F.3d 1061, 1067-1068 [reference to 'other equitable relief' makes sense only if the relief previously described relief is itself equitable].)

Even an award of civil penalties under the IFPA is determined based on equitable principles.  Thus, if the court—not a jury—finds, after considering equitable factors such as

disgorgement, unlawful profit, restitution, costs of investigation and prosecution, and the social costs of increased insurance rates due to fraud, that civil penalties are punitive, it must adjust them "appropriately," i.e., equitably.

Further, the IFPA has a fundamentally equitable purpose: To investigate, discover and deter insurance frauds, not to compensate a plaintiff for actual damages sustained. The act makes no reference to compensatory damages; assessments are levied in relation not to damages—there need *be* no damages—but to the dollar amount of claims submitted to insurers.

Finally, the primary right to bring an action for civil penalties pursuant to the IFPA is given to the state rather than individuals seeking compensation. (§ 1871.7, subd. (d) [commissioner or district attorney may bring a civil action].) Even though the IFPA authorizes a qui tam action to enforce its provisions, if the commissioner elects to intervene, the CDI bears "the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action" (§ 1871.7, subd. (f)(l)).

The IFPA's remedial purpose, the primacy given to state action, and statutory remedies, including civil penalties, that are not damages at law but constitute equitable relief appropriate and incidental to enforcement of the act, render a cause of action brought pursuant to the act more in the nature of an action to enforce public rights, not to vindicate individual injuries. As such, the gist of such a cause of action is equitable, which does not entitle the CDI or Rapier to a jury trial. (See *DiPirro v. Bondo*, *supra*, 153 Cal.App.4th at p. 184.)

A final consideration supports denial of a jury trial here. Stepping back from equitable elements inhering in the IFPA

itself, the threshold issue with respect to plaintiffs' false claim cause of action—whether a hospital's operation of a detox facility requires separate approval or a separate license from the CDPH—is a question purely of administrative law, one the Legislature has relegated to the CDPH. The CDPH has at all relevant times been aware of Encino Hospital's activities but has never required separate approval for its detox center. Plaintiffs purport in this action to supplant CDPH's health licensing expertise. Assuming for the sake of argument this is a proper invocation of the IFPA, a matter we need not decide today despite the parties' and amici's extensive briefing on the issue, healthcare licensing is quintessentially an administrative endeavor. Whether a hospital's supplemental service requires separate CDPH approval involves the "nuanced and qualitative" consideration of a variety of factors and circumstances identified in CDPH's administrative guidelines, and is "the type of decision that has traditionally been viewed as the province of courts rather than juries." (*Nationwide*, *supra*, 9 Cal.5th at p. 304; see also *McHugh v. Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348, 380 ["no jury trial right exists as to adjudication of a matter otherwise properly within the regulatory power of an administrative agency"].)

As with the Unfair Competition Law at issue in *Nationwide*, an overarching legislative concern in enacting the healthcare licensing scheme was doubtless to provide a streamlined procedure for informed and uniform regulation of California's healthcare industry. Although we assume for the sake of argument that the CDI may properly insert itself into this scheme, in effect regulating the healthcare industry through a

30

backdoor opened by the IFPA, we find no reason to permit a jury to do so.

Rapier cites to three IFPA cases that were tried to juries, but none decided the jury-trial issue. A case is no authority for unconsidered propositions. (*In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388.)

Rapier argues that the fixed minimum for an IFPA civil penalty renders the action akin to one at law to recover a debt. But even if this is true, the IFPA still obligated the trial court under subdivision (c) of section 1871.7 to reduce penalties "appropriately" pursuant to an equitable analysis. Thus, even if a civil penalty was in the nature of a private debt, a point we do not decide, civil penalties under the IFPA are ineluctably equitable.

We conclude that the essential character and purpose of the IFPA is equitable. Therefore, CDI and Rapier had no right to a jury trial.[9]

### 2. Continuance

Two months before trial, CDI moved for a continuance on the ground that the sheer volume of documents produced would require more than two months of preparation. The trial court denied the request without prejudice. CDI never renewed the request. On the contrary, on the day of trial CDI answered ready for trial, and when the court gave it an opportunity to address

---

[9] The parties and amici argue at great length about whether the IFPA applies to preferred provider organizations (PPOs), Employee Retirement Income Security Act (ERISA) plans, plans regulated by the California Department of Managed Health Care, or insurance companies from other states. Given today's result we need not reach those issues.

"anything else" before opening statements, CDI raised no concern about lack of time to prepare.

By failing to seek a continuance when it had the chance, CDI forfeits any claim of error on appeal.

## F.     Costs

The trial court awarded the Prime defendants $20,291.11 for enlargements and photocopies of exhibits.  Rapier contends this was an inappropriate item of costs, especially so with respect to copies not used at trial.  We disagree.

A prevailing party in civil litigation is entitled to recover costs incurred in the litigation "[e]xcept as otherwise expressly provided by statute."  (Code Civ. Proc., § 1032, subd. (b).)  Code of Civil Procedure section 1033.51 sets forth specific items of costs that are allowed or prohibited.  (§ 1033.5, subds. (a), (b).)  The statute also authorizes the trial court in its discretion to award or deny an item of costs not mentioned in this section.  (§ 1033.5, subd. (c)(4); hereafter subdivision (c)(4).)  All costs, whether expressly permitted under section 1033.5, subdivision (a) or awarded in the trial court's discretion pursuant to subdivision (c)(4), must be "reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation" (§ 1033.5, subd. (c)(2)) and "reasonable in amount" (§ 1033.5, subd. (c)(3)).

We review a trial court's cost award for abuse of discretion. (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.)

The trial court awarded the Prime defendants costs incurred in preparing photocopies of exhibits under subdivision (a)(13) of Code of Civil Procedure section 1033.5 (hereafter subdivision (a)(13)), which allows the recovery of costs for models, enlargements, and photocopies of exhibits "if they were

32

reasonably helpful to aid the trier of fact," even though the exhibits were not ultimately used at trial.

Our Supreme Court recently held that costs related to unused photocopies of trial exhibits and demonstratives are not categorically recoverable under subdivision (a)(13), but may still be awarded in the trial court's discretion pursuant to section subdivision (c)(4). (*Segal v. ASICS America Corp.* (2022) 12 Cal.5th 651, 657.) Here, the trial court exercised its discretion under subdivision (a)(13) in determining that unused exhibits were reasonably helpful to aid the trier of fact. Although that award was ultimately mis-categorized, the same discretion exercised under subdivision (a)(13) supported awarding the costs under subdivision (c)(4).

Rapier argues that because section 1871.7, subdivision (g)(5) of the IFPA authorizes attorney's fees and expenses for a defendant in only limited circumstances, this limitation occupies the field, and a defendant is not entitled to costs otherwise awardable in civil actions. We disagree.

Section 1871.7, subdivision (g)(5), provides: "If the district attorney or commissioner does not proceed with the action, and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorney's fees and expenses if . . . the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment."

Because subdivision (b) of Code of Civil Procedure section 1032 grants a prevailing party the right to recover costs "[e]xcept as otherwise expressly provided by statute," we must determine whether section 1871.7, subdivision (g)(5) provides an "express" exception. Although that section gives a prevailing defendant the

right to recover "attorney's fees and expenses" in a frivolous action in which the commissioner has declined to intervene, the statute makes no mention of costs awarded in other circumstances.  In other words, it does not expressly disallow recovery of costs by prevailing defendants in other circumstances; any suggestion that prevailing defendants are prohibited from recovering their costs in other circumstances is at most implied. Accordingly, based on the plain meaning of the words of the statutes in question, we conclude subdivision (g)(5) of section 1871.7 does not provide an "express" exception to the general rule permitting a prevailing defendant to recover its costs under Code of Civil Procedure section 1032.  (See *Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 991 [statute permitting recovery of costs in some circumstances does not express disallow costs in other circumstances].)

Rapier argues that because the trial court ordered an electronic exchange of exhibits, the award of costs for three photocopied sets of exhibits—as exhibit lists changed—was an abuse of discretion.  We disagree.  Even if exhibits are exchanged electronically, a trial court could reasonably conclude that photocopies of those exhibits will be necessary for trial.  The court could further reasonably conclude that costs of re-preparing exhibits as exhibit lists change is reasonable considering the practical burdens of preparing for trial as the scope of a case changes.

## G.    Requests for Judicial Notice

Plaintiffs' requests for judicial notice of legislative materials are granted.  (Evid. Code, § 451, subd. (a).)  Rapier's requests for judicial notice of legislative materials are granted.

(*Ibid*.)  The CDI's request for judicial notice of health care materials are granted.  (Evid. Code, § 451, subds. (c) & (h).)

## DISPOSITION

The judgment and rulings on posttrial orders are affirmed. The Prime defendants are to recover costs on appeal.


CHANEY, J.

We concur:


ROTHSCHILD, P. J.


BENKE, J.*

---

* Retired Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

35

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| STATE OF CALIFORNIA ex rel. MARY LYNN RAPIER et al., <br><br>     Plaintiffs and Appellants, <br><br>     v. <br><br> ENCINO HOSPITAL MEDICAL CENTER et al., <br><br>     Defendants and Respondents. | B302426, B303196 <br><br> (Los Angeles County Super. Ct. No. BC641254) <br><br><br> ORDER MODIFYING OPINION AND DENYING REHEARING, CERTIFYING OPINION FOR PUBLICATION <br><br> [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on December 21, 2022, be modified as follows:

1. On page 2, in the first sentence in the opening paragraph, "Fraud" is changed to "Frauds."

2. On page 2, last line, the sentence "We affirm the judgment" is changed to "We affirm the judgment and postjudgment order."

3. On page 4, footnote 2 is moved to the end of the first sentence in the opening paragraph on page 2.

4. On page 3, "Ins. Code," is deleted from the statutory reference in the last paragraph.

5. On page 4, "Ins. Code," is deleted from the statutory reference in the first paragraph.

6. On page 15, the word "appeals" in the last line is changed to "appeal."

7. On page 19, in the first line of the penultimate paragraph, the word "a" is inserted before "health facility."

8. On page 22, in the penultimate sentence, "fails for lack of a predicate" is changed to "fails for lack of any predicate false claim."

9. On page 28, at the end of the second full paragraph, in the bracketed text for the citation to *Lutz v. Glendale Union High School* (9th Cir. 2005) 403 F.3d 1061, 1067-1068, the third use of "relief" is deleted.

10. On page 31, in the last sentence of the antepenultimate paragraph, "even if a civil penalty was in the nature of a private debt" is changed to "even if a civil penalty is in the nature of a private debt."

11. On page 34, in the bracketed phrase at the end of the first paragraph, "express" is changed to "expressly."

12. On page 35, first line, "The CDI's request" is changed to "The CDI's requests."

13. On page 35, in the Disposition, the phrase "rulings on posttrial orders" is changed to "postjudgment order."

These modifications effect no change in the judgment.

Relator's petition for rehearing is denied.

The opinion in the above-entitled matter filed on December 21, 2022, was not certified for publication in the Official Reports.

2

For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.


_____

ROTHSCHILD, P. J.      CHANEY, J.         BENKE, J.*

_____

     * Retired Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.